A&F TRADEMARK, INC.; CACIQUECO, INC.; EXPRESSCO, INC.; LANCO, INC.; LERNCO, INC.; LIMCO INVESTMENTS, INC.; LIMTOO, INC.; STRUCTURECO, INC.; AND V. SECRET STORES, INC., PETITIONERS v. E. NORRIS TOLSON, SECRETARY OF REVENUE, STATE OF NORTH CAROLINA, AND HIS SUCCESSORS, RESPONDENTS

No. COA03-1203

(Filed 7 December 2004)

**1. Taxation— Delaware trademark holding company—income taxes**

The Court of Appeals rejected the argument that an administrative rule exceeded statutory provisions in the imposition of income tax liability on Delaware trademark holding companies whose related retail companies did business in North Carolina. The Legislature endorsed the Secretary of Revenue's interpretation of the statute (in the administrative rules) by not amending the statute.

**2. Taxation— Delaware trademark holding company—franchise taxes**

The Department of Revenue did not exceed its authority by imposing franchise taxes on Delaware trademark holding companies whose related retail companies did business in North Carolina. If, as the taxpayers contend, the heart of the franchise tax statute is the State's expectation of a return for what has been provided, the quid pro quo for which the State can expect a return is the provision of privileges and benefits that fostered and promoted the related retail companies, including an orderly society in which to do business.

**3. Constitutional Law— Commerce Clause—trademark licensing—physical presence in NC**

There is a substantial nexus sufficient to satisfy the Commerce Clause in a taxation case where a wholly-owned subsidiary licenses trademarks to a related retail company operating stores in North Carolina. The contention that physical presence is the sine quo non under the Commerce Clause for income and franchise taxes is rejected.

**4. Taxation— trademark holding company—excluded corporations**

Trademark holding companies were correctly classified as excluded corporations (companies which receive more than half their income from dealing in intangible property) and the appropriate tax apportionment formula was used. It does no violence to the plain meaning of "deal in" to hold that it encompasses these activities.

Appeal by petitioners from order entered 22 May 2003 by Judge A. Leon Stanback in Wake County Superior Court. Heard in the Court of Appeals 8 June 2004.

*Womble, Carlyle, Sandridge & Rice, by Burley B. Mitchell, Jr. and Sean E. Andrussier; Morrison & Foerster, L.L.P., by Paul H. Frankel and Hollis L. Hyans; and Alston & Bird, L.L.P., by Jasper L. Cummings, Jr., for petitioners-appellants.*

*Attorney General Roy Cooper, by Assistant Attorney General Kay Linn Miller Hobart, for respondent-appellee.*

*Nelson, Mullins, Riley & Scarborough, L.L.P., by George M. Teague, on behalf of North Carolina Manufacturers Association, North Carolina Citizens for Business and Industry, North Carolina Biosciences Organization, and North Carolina Electronics and Information Technologies Association, amici curiae.*

CALABRIA, Judge.

This appeal involves the assessment of corporate franchise and income taxes against A&F Trademark, Inc., Caciqueco, Inc., Expressco, Inc., Lanco, Inc., Lernco, Inc., Limco Investments, Inc., Limtoo, Inc., Structureco, Inc., and V. Secret Stores, Inc. (collectively, the "taxpayers"). Each of the taxpayers is a wholly-owned, non-domiciliary subsidiary corporation of the Limited, Inc. (the

**A&F TRADEMARK, INC. v. TOLSON**

[167 N.C. App. 150 (2004)]

"Limited"), an Ohio corporation. Since 1963, the Limited has been engaged in retail sales and is currently engaged in the nationwide retail sale of men's, women's, and children's clothing and accessories via separate retail operating subsidiaries (the "related retail companies"), nine of which operate in North Carolina.[1] These related retail companies have over 130 locations in North Carolina.

Since the beginning of operations, the Limited developed and cultivated intangible intellectual property including trademarks, trade names, service marks, and associated goodwill. In so doing, the Limited incurred substantial expenses, which were deducted from gross income and reduced federal and North Carolina income taxes. In addition, all of the Limited's intellectual property was registered, monitored, policed, and defended against infringement by the Limited's own in-house legal counsel. During the 1980's and early 1990's, however, the Limited properly incorporated the taxpayers in Delaware as trademark holding companies and properly assigned to each of the taxpayers certain trademarks in separate I.R.C. § 351 tax-free exchanges. Each related retail company that assigned its trademark and associated goodwill to the related trademark holding company received little or no consideration for the transfer and did not have the trademark valued by a third party for a determination of its actual worth. The record on appeal indicates the trademarks at issue in this case had a value of approximately $1.2 billion dollars.

After the trademarks were assigned to the taxpayers, the related retail companies and the taxpayers entered into licensing agreements whereby the related retail companies licensed the marks back from the taxpayers.[2] The net result of the assignment and licensing back was that there was no change in the day-to-day operations of the related retail companies. However, each licensing agreement required the related retail company to pay to the proper taxpayer, as licensor, a royalty payment for the use of the trademark in the amount of five to six percent of its retail operating gross sales. These payments were made by an accounting journal entry. No checks were written and no physical transfer of funds occurred. Subsequently, the

---

1. The nine retail companies are The Limited Stores, Inc., Cacique, Inc., Express, Inc., Lane Bryant, Inc., Lerner, Inc., Limited Too, Inc., Structure, Inc., Victoria's Secret, Inc., and Abercrombie & Fitch.

2. Limco Investments, Inc. ("Limco") licensed trademark rights to The Limited, Inc.; Caciqueco, Inc. to Cacique, Inc.; Expressco, Inc. to Express, Inc.; Lanco., Inc. to Lane Bryant, Inc.; Lernco, Inc. to Lerner, Inc.; Limtoo, Inc. to Limited Too, Inc.; Structureco, Inc. to Structure, Inc.; V. Secret Stores, Inc. to Victoria's Secret, Inc.; and A&F Trademark, Inc. to Abercrombie and Fitch, Inc.

**A&F TRADEMARK, INC. v. TOLSON**

[167 N.C. App. 150 (2004)]

taxpayers entered into agreements loaning any excess operating funds back to the related retail companies in the form of notes receivable bearing a market rate of interest.[3] No attempts were made to collect any outstanding notes, and they were marked "Do Not Collect." Under the licensing and loan agreements, the related retail companies collectively paid to the taxpayers $301,067,619 in royalties and $122,031,344 in interest in 1994, accounting for 100% of the taxpayers' income for that year. The related retail companies deducted these royalty and interest expenses for tax purposes. The taxpayers have no employees and share office space, equipment, and supplies; their listed primary office address is also the primary office address of approximately 670 other companies unrelated to the Limited or its wholly-owned subsidiaries.

The taxpayers did not file corporate franchise and income tax returns in North Carolina for their fiscal years ending 31 January 1994. North Carolina's Secretary of Revenue (the "Secretary" or "respondent") gave notice of proposed assessments of corporate franchise and income tax. The taxpayers protested and, after an administrative hearing, the Secretary issued a final decision on 19 September 2000 sustaining the proposed assessments against the taxpayers without penalties. The taxpayers appealed to the Tax Review Board, which affirmed the final decision. The taxpayers filed a petition in Wake County Superior Court, requesting that the decision be reversed or, in the alternative, modified. By order filed 22 May 2003, the trial court summarily determined that the "Administrative Decision of the Tax Review Board should be affirmed in its entirety." From that order, the taxpayers appeal to this Court.

On appeal, two primary issues are presented. First, we must determine whether the taxpayers were "doing business" in North Carolina under the relevant statutory provisions, and second, we must determine whether respondent's attempt to assess the taxes in the instant case offends the Commerce Clause of the United States Constitution. If we conclude the taxpayers were doing business and the tax imposed was constitutionally sound, we must further determine whether the taxpayers are "excluded corporations" under N.C. Gen. Stat. § 105-130.4(a)(4) (2003). Each issue involves either a question of statutory construction or the taxpayers' constitutional rights. Accordingly, our standard of review is *de novo*. *Piedmont Triad*

---

3. By way of example, the Tax Review Board found that, for the tax years 1992 through 1994, "Limco's total expenses . . . were $729,175, [or] 0.2% of its total accrued income of $311,952,574 during the same period."

*Airport Auth. v. Urbine*, 354 N.C. 336, 338, 554 S.E.2d 331, 332 (2001); *In re Proposed Assessments v. Jefferson-Pilot Life Ins. Co.*, 161 N.C. App. 558, 559, 589 S.E.2d 179, 180 (2003).

## I. Doing Business

The taxpayers first assert the Department of Revenue ("DOR") lacked statutory authority to tax them because they were not "doing business" in North Carolina. Specifically, the taxpayers assert "they did not transact business in this State and [neither sought nor] were required to seek . . . authorization to conduct business in this State." In addition, the taxpayers point out they had no offices, employees, tangible property, transactions with residents, or customer service in North Carolina.

## A. Income Tax

**[1]** Under N.C. Gen. Stat. § 105-130.3 (2003), "[a] tax is imposed on the State net income of every C Corporation doing business in this State." In administering the duties under N.C. Gen. Stat. § 105-130.3, the Secretary adopted N.C. Admin. Code tit. 17, r. 5C.0102(a) (2004), defining "doing business in this State" as that phrase was used in the statute for income tax purposes. N.C. Admin. Code tit. 17, r. 5C.0102(a) provides, in pertinent part, as follows:

> For income tax purposes, the term "doing business" means the operation of any business enterprise or activity in North Carolina for economic gain, including . . . the owning, renting, or operating of business or income-producing property in North Carolina including . . . [t]rademarks [and] tradenames . . . .

According to our Supreme Court, " '[t]he construction adopted by the administrators who execute and administer a law in question is one consideration where an issue of statutory construction arises.' " *Polaroid Corp. v. Offerman*, 349 N.C. 290, 301, 507 S.E.2d 284, 293 (1998) (quoting *John R. Sexton & Co. v. Justus*, 342 N.C. 374, 380, 464 S.E.2d 268, 271 (1995)). "[S]uch construction is 'strongly persuasive' and . . . entitled to 'due consideration.' " *See id.*, 349 N.C. at 302, 507 S.E.2d at 293 (quoting *Shealy v. Associated Transp., Inc.*, 252 N.C. 738, 742, 114 S.E.2d 702, 705 (1960)). Indeed, under operation of N.C. Gen. Stat. § 105-264 (2003), the Secretary's interpretation of a statute he administers is "prima facie correct."

The taxpayers assert N.C. Admin. Code tit. 17, r. 5C.0102(a) "is of no consequence" because amendments to the income tax statute

occurring in 2001 (the "2001 amendments") indicates "that the agency's rule [improperly] expanded the income tax statute" instead of interpreting it. *See Duke Power Co. v. Clayton, Comr. of Revenue*, 274 N.C. 505, 511, 164 S.E.2d 289, 294 (1968) (holding an administrative interpretation "cannot change the meaning of a statute or control the Court's interpretation of it"). The taxpayers argue the only possible purpose for the 2001 amendments was to "cover the receipt of royalty income from the in-state use of licensed trademarks[;]" therefore, the administrative rule must be deemed an improper expansion of the statute prior to 2001.

During the 2001 session, the General Assembly amended "Part 1 of Article 4 of Chapter 105 of the General Statutes . . . by adding a new section." 2001 N.C. Sess. Laws 327, s. 1.(b). The bill amending the statute was entitled "An Act to Combat Tax Fraud, Enhance Corporate Compliance with Taxes on Trademark Income, [and] Assure that Franchise Tax Applies Equally to Corporate Assets[.]" 2001 N.C. Sess. Laws 327. The 2001 amendments added a royalty income reporting option with the stated purpose of "provid[ing] taxpayers with an option concerning the method by which . . . royalties [received for the use of trademarks in North Carolina as income derived from doing business in this State] can be reported for taxation when the recipient and the payer are related members."[4] *Id.*, s. 1.(a). The General Assembly expressed its intent in enacting the royalty reporting option as follows: "It is the intent of this section [N.C. Gen. Stat. § 105-130.7A] to reward taxpayers who comply [with the State tax on income generated from using trademarks in manufacturing and retailing activities]." 2001 N.C. Sess. Laws 327, s. 1.(a). Examining the title, purpose, and intent of the 2001 amendments, it is clear that the taxpayers' contention cannot be sustained.

First, the title of the bill clearly denotes that its function was to enhance compliance "with the State tax on income generated from using trademarks in [manufacturing and retailing] activities." *Id.* Though elementary in nature, we note such a function necessarily contemplates not only that current corporate practices were insufficiently compliant but also that there existed such enacted taxes on trademark income with which corporations were actually required to comply. Second, in a related manner, the title of the amendment des-

---

4. Royalty is defined as "[a]n amount charged that is for, related to, or in connection with the use in this State of a trademark. The term includes royalty and technical fees, licensing fees, and other similar charges." 2001 N.C. Sess. Laws 327, s. 1.(b). Our use of the term royalty or royalty income will apply to both the taxpayers' royalty and interest income.

ignates that its function, in part, was to combat tax fraud. It is difficult to determine how tax fraud could occur in the absence of laws or regulations requiring the payment of taxes. *See Black's Law Dictionary* 1474 (7th ed. 1999) (defining tax fraud and tax evasion as "[t]he willful attempt to defeat or circumvent the tax law in order to illegally reduce one's tax liability"). Third, the stated purpose was merely to add a reporting option to the income tax statute, not to modify or change what constituted taxable income.[5] Fourth, the intent of the legislature is made clear on the face of the session law: to reward corporations complying with state income tax provisions imposing taxes on the use of trademarks in certain activities, including retailing. In summary, the language contained in the 2001 amendments supports the premise that N.C. Admin. Code tit. 17, r. 5C.0102(a) was consistent with N.C. Gen. Stat. § 105-130.3 rather than an expansion of it.

Our determination that the 2001 amendments endorsed rather than changed the scope of the income tax statute has fatal effects on the remaining arguments asserted by the taxpayers. The taxpayers' remaining arguments depend on the premise that the phrase "doing business in this State" in N.C. Gen. Stat. § 105-130.3 does not encompass their activities in North Carolina; therefore, DOR exceeded its statutory authority in imposing the income taxes at issue in the instant case. However, the taxpayers have proffered no other argument against the Secretary's interpretation and have thus failed to rebut the presumption that it is *prima facie* correct. This is especially true in light of our discussion concerning the 2001 amendments, which indicates that the administrative rule, at all times, has properly reflected the policy of the General Assembly for income taxation of trademark royalty payments.

"[T]he legislature is always presumed to act with full knowledge of prior and existing law . . . ." *Polaroid Corp.*, 349 N.C. at 303, 507 S.E.2d at 294. Thus, when a statute is interpreted, and the legislature acquiesces in that interpretation by failing to amend the statutory provision, our courts assume the legislature "is satisfied with that interpretation" and accord it " 'great weight in arriving at [the statute's] meaning.' " *Id.* (quoting *State v. Emery*, 224 N.C. 581, 587, 31 S.E.2d 858, 862 (1944)). The administrative rule as modified in 1992 is directly applicable for income tax purposes to the taxpayers' activ-

---

5. That the amendment was designed to permit corporations to change the method of reporting fully explains why it is to be applied prospectively. *See* 2001 N.C. Sess. Laws 327, s. 1.(f).

ities in North Carolina. In the following two years, the General Assembly did nothing to indicate its dissatisfaction with N.C. Admin. Code tit. 17, r. 5C.0102(a), and nine years later, it amended Article 4 of Chapter 105 of the General Statutes to add a royalty income reporting option *to reward and enhance compliance* with N.C. Admin. Code tit. 17, r. 5C.0102(a), the administrative rule the taxpayers assert is of "no consequence." Far from passively acquiescing in the Secretary's interpretation, the General Assembly endorsed it. Accordingly, we find unpersuasive any argument that the administrative rule exceeded the reach of the statutory income tax provisions as contemplated by the General Assembly.

B. Franchise Tax

[2] The taxpayers also assert the imposition of franchise taxes by DOR exceeded its statutory authority. North Carolina General Statutes § 105-122 (2003) imposes a franchise tax on "[e]very corporation . . . doing business in" North Carolina. For franchise tax purposes, "doing business" is defined as "[e]ach and every act, power, or privilege exercised or enjoyed in this State, as an incident to, or by virtue of the powers and privileges granted by the laws of this State." N.C. Gen. Stat. § 105-114(b)(3) (2003).[6] Our Supreme Court has characterized this tax as one "imposed upon corporations for the opportunity and privilege of transacting business in this State. It is an annual tax which varies with the nature, extent and magnitude of the business conducted by the corporation in this State." *Realty Corp. v. Coble, Sec. of Revenue*, 291 N.C. 608, 611, 231 S.E.2d 656, 658 (1977). The taxpayers assert the franchise tax is a *quid pro quo* where the business compensates the State for the burden of protecting and fostering the endeavor, and such a *quid pro quo* is "utterly lacking here." We disagree.

It is beyond dispute that North Carolina has provided privileges and benefits that fostered and promoted the related retail companies. By affording these benefits to the related retail companies, additional benefits have inured to the taxpayers. If, as the taxpayers assert, the heart of the franchise tax statute is the legitimate expectation of the State to ask for something in return for that which it has provided, we fail to see how North Carolina has not promoted or fostered the taxpayers' endeavors. In addition, we agree with the broad rationale

---

6. We agree with the taxpayers that N.C. Admin. Code tit. 17, r. 5C.0102(a), which by its own terms is "[f]or income tax purposes," has no application to DOR's authority to impose a franchise tax in this case.

accepted by the Supreme Court of South Carolina that by providing an orderly society in which the related retail companies conduct business, North Carolina has made it possible for the taxpayers to earn income pursuant to the licensing agreements. *See Geoffrey, Inc. v. South Carolina Tax Commission*, 437 S.E.2d 13, 18 (S.C. 1993) (upholding a tax imposed on that portion of a non-domiciliary trademark holding company's income derived from the use of its trademarks and trade names within South Carolina by a related retail company). The protection of North Carolina's marketplace by the State provides the *quid pro quo* for which the State can expect a return. We hold the taxpayers were "doing business in this State;" therefore, the State did not exceed its authority by imposing franchise taxes.

## II. Commerce Clause

[3] The taxpayers alternatively assert that, even if they were doing business within the contemplation of the applicable statutory provisions, the Commerce Clause of the United States Constitution forbids North Carolina from imposing the taxes at issue in this case. The taxpayers contend they have no "substantial nexus" with North Carolina on the grounds that they have no physical presence within the State.

The United States Constitution vests the United States Congress with the power "[t]o regulate commerce with foreign nations, and among the several states[.]" U.S. Const. art I, § 8, cl.3. "[T]he Commerce Clause is more than an affirmative grant of power; it has a negative sweep as well. . . . '[B]y its own force' [it] prohibits certain state actions that interfere with interstate commerce." *Quill Corp. v. North Dakota*, 504 U.S. 298, 309, 119 L. Ed. 2d 91, 104 (1992) (quoting *South Carolina State Highway Dept. v. Barnwell Brothers, Inc.*, 303 U.S. 177, 185, 82 L. Ed. 734, 739 (1938)). This "negative sweep" is commonly referred to as the dormant Commerce Clause, which has been interpreted to limit a state's power to tax. *Id.*

Under current United State Supreme Court jurisprudence, a tax challenged on Commerce Clause grounds will be upheld where it "[1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 51 L. Ed. 2d 326, 331 (1977). "The second and third parts of [the *Complete Auto*] analysis . . . prohibit taxes that pass an unfair share of the tax burden onto interstate commerce. The first and fourth

prongs . . . limit the reach of the state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce." *Quill*, 504 U.S. at 313, 119 L. Ed. 2d at 107. Nonetheless, the Supreme Court has repeatedly reiterated that "[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of [the] state tax burden even though it increases the cost of doing the business." *Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254, 82 L. Ed. 823, 827 (1938).

The taxpayers' assertion on appeal, that they did not have a substantial nexus with North Carolina because they have no physical presence in this State, is premised upon the first prong of the *Complete Auto* test. The taxpayers contend that the presence of their intangible property in North Carolina is irrelevant in light of the lack of physical presence of offices, facilities, employees, and real or tangible property, and that the Supreme Court's rulings in *National Bellas Hess, Inc. v. Department of Revenue*, 386 U.S. 753, 18 L. Ed. 2d 505 (1967) and *Quill* mandate that this Court find the tax sought to be imposed by the State violates the Commerce Clause. We disagree.

Both *Bellas Hess* and *Quill* involved attempts by a state to require out-of-state mail-order vendors to collect and pay use taxes on goods purchased within the state despite the fact that the vendors had no outlets or sales representatives in the state. The Supreme Court's decision in *Bellas Hess* "stands for the proposition that a vendor whose only contacts with the taxing State are by mail or common carrier lacks the 'substantial nexus' required by the Commerce Clause." *Quill*, 504 U.S. at 311, 119 L. Ed. 2d at 106. In 1992, *Quill* reaffirmed and clarified the holding in *Bellas Hess* and unequivocally divorced the respective nexus requirements of the Due Process Clause and the Commerce Clause. *Id.*, 504 U.S. at 312, 119 L. Ed. 2d at 106. In doing so, the Supreme Court cited the divergent aims of the two clauses: due process "centrally concerns the fundamental fairness of government activity" as against an "individual defendant" as opposed to the Commerce Clause's focus on the "structural concerns about the effects of state regulation on the national economy." *Id.* Crucial to the taxpayers' argument on appeal, the Supreme Court in *Quill* ultimately concluded that, for purposes of sales and use taxes assessed against vendors whose only contact with a state is by mail or common carrier, the substantial nexus prong of *Complete Auto* could appropriately be determined by application of a "bright-line, physical-presence requirement." *Id.*, 504 U.S. at 317, 119 L. Ed. 2d at 110. The taxpayers suggest this requirement applies to *all taxes*

employed by the states for Commerce Clause nexus analyses and, specifically, must be used in determining whether the taxes in the present case are constitutionally infirm. We decline to adopt the broad reading of *Quill* suggested by the taxpayers for numerous reasons.

First, the tone in the *Quill* opinion hardly indicates a sweeping endorsement of the bright-line test it preserved, and the Supreme Court's hesitancy to embrace the test certainly counsels against expansion of it. In its discussion of the Commerce Clause, the Supreme Court briefly summarized the numerous and shifting analyses endorsed since recognition of the dormant Commerce Clause. The Court went on to note that, while *Bellas Hess* did not conflict with recent Commerce Clause cases, "contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise for the first time today." *Quill*, 504 U.S. at 311, 119 L. Ed. 2d at 105. The Court stated that the evolution of its "recent Commerce Clause decisions . . . signaled a 'retreat from the formalistic constrictions of a stringent physical presence test in favor of a more flexible substantive approach[.]' " *Quill*, 504 U.S. at 314, 119 L. Ed. 2d at 107. The Court further observed the physical-presence test, though offset by the clarity of the rule, was "artificial at its edges." *Quill*, 504 U.S. at 315, 119 L. Ed. 2d at 108. In addition, the Court twice noted that in other types of taxes, it had never articulated the same physical-presence requirement adopted in *Bellas Hess, see Quill*, 504 U.S. at 314 and 317, 119 L. Ed. 2d at 108 and 110, but cautioned that the failure to expand the *Bellas Hess* rule established for sales and use taxes to other types of taxes did not imply that the *Bellas Hess* rule as applied to sales and use taxes was vestigial or disapproved. *Id.* Nonetheless, the Court's choice to abstain from rejecting the *Bellas Hess* rule for sales and use taxes fails to argue persuasively that the rule should, for lack of rejection, be augmented to cover other types of tax. While the Supreme Court may ultimately choose to expand the scope of the physical-presence test reaffirmed in *Quill* beyond sales and use taxes, its equivocal reaffirmation of that test does not readily make that choice self-evident.

Second, retention of the *Bellas Hess* test was grounded, in no small part, on the principle of *stare decisis* and the "substantial reliance" on the physical-presence test, which had "become part of the basic framework of a sizable industry." *Quill*, 504 U.S. at 317, 119 L. Ed. 2d at 110. Neither consideration advocates for the position adopted by the taxpayers in the present case. We need look no further

than the language in *Quill* to summarily dispense with the possibility that *stare decisis* plays an analogous role in the instant case: the Supreme Court, as noted before, twice expressed that the bright-line, physical-presence requirement of *Bellas Hess* had not been adopted in other forms of taxation. Moreover, since the physical-presence requirement has never been established by judicial precedent for other forms of taxation and since this form of tax reduction in the instant case is relatively new, we dismiss the possibility that analogous substantial reliance, as contemplated in *Quill*, exists in this case.

Third, there are important distinctions between sales and use taxes and income and franchise taxes "that makes the physical presence test of the vendor use tax collection cases inappropriate as a nexus test[.]" Jerome R. Hellerstein, Geoffrey *and the Physical Presence Nexus Requirement of* Quill, 8 State Tax Notes 671, 676 (1995). "[T]he use tax collection cases were based on the vendor's activities in the state, whereas" the income and franchise taxes in the instant case are based solely on "the use of [the taxpayer's] property in th[is] state by the licensee[s]" and not on any activity by the taxpayers in this State. *Id.* The "Supreme Court has made it clear that the presence of the recipient of income from intangible property in a state is not essential to the state's income tax on income of a nonresident." *Id.* (citing *International Harvester Co. v. Wisconsin Dept. of Taxation*, 322 U.S. 435, 441-42, 88 L. Ed. 1373, 1380 (1944) for the proposition that states are entitled to tax a non-resident's income to the extent it is "fairly attributable either to property located in the state or to events or transactions which, occurring there, are subject to state regulation and which are within the protection of the state and entitled to the numerous other benefits which it confers").[7] Since the tax at issue in this case is not based on the taxpayers' activity in North Carolina, but rather on the taxpayers' receipt of income from the use of the taxpayers' property in this State by a commonly-owned third party, "it would [be] inappropriate and, indeed, anomalous . . . [to determine] nexus by [the taxpayers'] activities or [their] physical presence" in North Carolina. *Id.* Moreover, "[u]nlike an income tax, a sales and use tax can make the taxpayer an agent of the state, obligated to collect the tax from the consumer at the point of sale and then

---

7. Opponents of *Geoffrey's* rationale vigorously resist the use of *International Harvester* on the grounds that it concerned a Due Process challenge. We acknowledge the validity of the point; however, the central holding of *International Harvester* has been overwhelmingly endorsed: a State in which a corporation conducts business and earns income may impose a tax on that portion earned therein.

pay it over to the taxing entity." *Kmart Properties, Inc. v. Taxation and Revenue Dep't. of New Mexico*, No. 21,140, at 13 (N.M. Ct. App. Nov. 27, 2001) ("*Kmart*").[8] "[A] state income tax is usually paid only once a year, to one taxing jurisdiction and at one rate, [but] a sales and use tax can be due periodically to more than one taxing jurisdiction within a state and at varying rates." *Id.*, at 13.

Given these reasons, we reject the contention that physical presence is the *sine qua non* of a state's jurisdiction to tax under the Commerce Clause for purposes of income and franchise taxes. Rather, we hold that under facts such as these where a wholly-owned subsidiary licenses trademarks to a related retail company operating stores located within North Carolina, there exists a substantial nexus with the State sufficient to satisfy the Commerce Clause. *Accord Geoffrey*, 437 S.E.2d at 18 (holding that "by licensing intangibles [to Toys 'R Us, an affiliated operating store,] for use in [South Carolina] and deriving income from their use [t]here, Geoffrey ha[d] a 'substantial nexus' with South Carolina"); *Kmart*, at 15 (holding that "the use of KPI's [the wholly-owned trademark holding company licensor] marks within New Mexico's economic market, for the purpose of generating substantial income for KPI, establishe[d] a sufficient nexus between that income and the legitimate interests of the state and justifie[d] the imposition of a state income tax").

We are also cognizant of the holding of the New Jersey Tax Court in a case involving one of the taxpayers before this Court on the same issue. *Lanco, Inc. v. Dir., Div. of Tax'n.*, 21 N.J. Tax 200 (2003). In that case, the New Jersey Tax Court concluded "that the physical presence of the taxpayer or its employee(s), agent(s), or tangible property in a jurisdiction has been and remains a necessary element for a finding of substantial nexus under the Commerce Clause of the United States Constitution." *Id.*, 21 N.J. Tax at 214. We respectfully disagree. Summarizing the salient portions of that opinion, the New Jersey Tax Court (1) found it "illogical" to have a physical presence as a constitutional necessity for sales and use taxes but not for income tax, (2) opined physical presence, as a prerequisite to state taxation of income, was "fully consistent with and strongly suggested by the Commerce Clause cases decided before *Quill*" because the circumstances of those cases involved taxpayers who were physically

8. *Kmart* was an unpublished opinion. Accordingly, while citation is disfavored and it has no binding precedential authority, we nonetheless consider and find persuasive those portions of the opinion reproduced herein. References to *Kmart* will provide page numbers as appearing on the copy of the opinion filed with the Clerk of the New Mexico Court of Appeals.

present in the state attempting to impose the tax, and (3) stated "other state court cases decided since *Quill* do not follow the *Geoffrey* rule." *Id.*, 21 N.J. Tax at 208-09.[9]

Regarding the first reason given by the New Jersey Tax Court, the *Quill* opinion itself twice notes the singularity of its adoption and reaffirmation of the physical-presence test for Commerce Clause nexus in the arena of sales and use taxes. Moreover, as illustrated by our analysis herein, we disagree with the New Jersey Tax Court that there do not exist certain distinctions between the tax at issue in *Quill* and those considered in the instant case that justify divergent treatment. Regarding the second reason, we do not accord the same import to pre-*Quill* cases in which it was far more likely that a taxpayer would be required to be physically present (in the traditional commercial sense) in a state in order to earn income there. Lastly, the third reason espoused by the New Jersey Tax Court rings hollow. For example, in discussing *General Motors Corp. v. City of Seattle*, 25 P.3d 1022 (Wn. App. 2001), *cert. den.*, 535 U.S. 1056, 152 L. Ed. 2d 825 (2002), the New Jersey Tax Court dismisses the Washington appellate court's express declaration that it "decline[d] to extend *Quill's* physical presence requirement" to a business and occupation tax on the basis that the taxpayers in that case had a physical presence in that jurisdiction. The corporation's physical presence can hardly serve to obscure the Washington Court's unequivocal choice to stand with *Geoffrey's* containment of the *Quill* physical-presence test. More importantly, any assertion that *Geoffrey* has not been, by and large, approved of in subsequent cases cannot be sustained. *See* J. Hellerstein & W. Hellerstein, State Taxation, Para. 6.11[3] at 6-16 (Warren, Gorham & Lamont, 3d ed. Cum. Supp. 2004) (comprehensively analyzing judicial and administrative post-*Geoffrey* developments and summarizing that, although mixed, "judicial and administrative reaction to the opinion across the country has generally supported [*Geoffrey's*] position that *Quill's* physical-presence test of Commerce Clause nexus does not extend to income taxes").

---

9. The taxpayers also argue, as persuasive authority, the holding of the Court of Appeals of Tennessee in *J.C. Penney National Bank v. Johnson*, 19 S.W.3d 831 (Tenn. Ct. App. 1999). We are not persuaded. While the reasoning of *J.C. Penney* appears, at first blush, to extend *Quill's* physical presence test to income taxes, the Tennessee Court expressly abstained from determining "whether 'physical presence' is required under the Commerce Clause[,]" *see id.*, 19 S.W.3d at 842, and a subsequent unpublished opinion from that same Court casts considerable doubt on whether it adopted "a bright-line test of requiring an out-of-state company to have a 'physical presence' in [Tennessee] in order to have a substantial nexus with it." *America Online, Inc. v. Johnson*, No. M2001-00927-COA-R3-CV, Tenn. Ct. App., July 30, 2002, at 2.

## III. Apportionment

[4] In their last assignment of error, the taxpayers assert the decisions below improperly concluded they were excluded corporations and improperly applied an unfavorable apportionment formula. In 1994, an "excluded corporation" was statutorily defined, in part, as "a corporation which receives more than fifty percent (50%) of its ordinary gross income from investments in and/or dealing in intangible property." N.C. Gen. Stat. § 105-130.4 (Cum. Supp. 1994). The taxpayers assert they "do not fit within that definition because they were not deriving their income from 'investments and/or dealing in' trademarks." Rather, taxpayers contend they earned revenue by "licensing, owning, managing and protecting trademarks," which lies outside of the plain meaning of "deal in" as set forth in *Chrysler Fin. Co. v. Offerman*, 138 N.C. App. 268, 273, 531 S.E.2d 223, 226 (2000) (defining "deal in" as "to engage in buying and selling some commodity" pursuant to *New Webster's Dictionary and Thesaurus of the English Language* 247 (1992)). While the definition used in *Chrysler* certainly constitutes one facet of the plain meaning of "deal" or "deal in," the recognition of that facet of the term's plain meaning does not and cannot obviate other commonly accepted definitions that provide the plain meaning of the term as used in the statute. For example, "deal" is defined as "to do business" by *The American Heritage College Dictionary* 356 (3rd ed. 1997). We do no violence to the plain meaning of "deal in" by holding that it encompasses the taxpayers' activities with respect to the trademarks. This assignment of error is overruled.

We have carefully considered the taxpayers' remaining arguments and find them to be without merit.

Affirmed.

Judges WYNN and LEVINSON concur.