## In re WASHINGTON MUTUAL, INC., et al., Debtors.

## No. 08–12229 MFW.

United States Bankruptcy Court, D. Delaware.

Dec. 19, 2012.

Amanda R. Steele, Andrew C. Irgens, Chun I. Jang, Cory D. Kandestin, Drew G. Sloan, Jason M. Madron, Lee E. Kaufman, Mark D. Collins, Travis A. McRoberts, Richards, Layton & Finger, P.A., Neil Raymond Lapinski, Afael Xavier Zahralddin–Aravena, Shelley A. Kinsella, Theodore Allan Kittila, Elliott Greenleaf, Wilmington, DE, David B. Hird, Jennifer L. Wine, Weil, Gotshal & Manges, LLP, David L. Permut, Goodwin Procter, LLP, Washington, DC, David M. Stern, Lee R. Bogdanoff, Matthew C. Heyn, Whitman L. Holt, Klee, Tuchin, Bogdanoff & Stern, LLP, Los Angeles, CA, Patricia Astorga, Rachel Barish Swartz, Richard W. Slack, Diana M. Eng, Weil, Gotshal & Manges, LLP, New York, NY, Julio C. Gurdian, Weil, Gotshal & Manges, Miami, FL, Lisa N. Cloutier, Weil, Gotshal & Manges, LLP, Boston, MA, Lisa R. Eskow, Weil, Gotshal & Manges, LLP, Houston, Travis A. McRoberts, Akin, Gump, Strauss, Hauer & Feld, LLP, Dallas, TX, Julie A. Finocchiaro, for Debtors.

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Objection of WMI Liquidating Trust (the "Trust"), as

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is incorporated by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

successor in interest to Washington Mutual, Inc. ("WMI") and WMI Investment Corp., to the proof of claim filed by the Oregon Department of Revenue ("Oregon"). For the reasons stated herein, the Court will sustain the Objection.

## I. BACKGROUND

WMI is a bank holding company that formerly owned Washington Mutual Bank ("WMB"). By the late 1990s, WMB was using real estate investment trusts ("REITs") as a source of funding and capital. In late 1999, each of the REITS became directly-owned subsidiaries of a holding company of WMI and changed their commercial domiciles from the State of Washington to Oregon.

WMB and certain of WMB's subsidiaries (the "WMB Entities") conducted banking-related operations in Oregon during taxable years 1999 through 2005. During this period, WMI and its direct and indirect subsidiaries, including the WMB Entities and the REIT Holding Companies (the "Consolidated Tax Group"), filed consolidated returns for federal tax purposes.[2]

As a result of a downgrade in WMI's and WMB's credit ratings and the global credit crisis, a bank run ensued resulting in more than $16 billion in deposits being withdrawn from WMB in a ten-day period beginning on September 15, 2008. On September 25, 2008, the Office of Thrift Supervision (the "OTS") seized WMB and appointed the Federal Deposit Insurance Corporation (the "FDIC") as the receiver. On the same day, the FDIC sold substantially all of WMB's assets to JPMorgan Chase.

On September 26, 2008, WMI and WMI Investment Corp. (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code. At that time, WMI's assets included its interest in non-banking subsidiaries, more than $4 billion of cash that WMI and its non-banking subsidiaries had on deposit at the WMB Entities immediately prior to the time the FDIC was appointed as receiver, and a claim against the FDIC for, inter alia, its common stock interest in WMB.

In 2008, Oregon conducted an audit of WMI and certain of its subsidiaries. By letter dated November 12, 2008, Oregon asserted that additional corporate excise taxes, penalties, and interest were due by WMI and its subsidiaries for tax years 2002 through 2006 (the "Taxable Period"). On March 17, 2009, WMI and Oregon attended an informal conference at which WMI contested the results of the Oregon audit. On October 8, 2009, Oregon's positions with respect to each of the audit issues was upheld and a notice of assessment was issued (the "Notice of Assessment"). On January 6, 2010, WMI timely filed a written appeal from the Notice of Assessment, which appeal remains pending. (D.I. 9115 at Ex. 23.)[3]

In the interim, Oregon filed a proof of claim in the Debtors' chapter 11 cases, pursuant to which Oregon sought payment of $29,381,722.91 for corporate excise taxes, interest, and penalties related to the Taxable Period. The Debtors objected to the claim on the basis that Oregon sought

---

**2.** The REITS, themselves, however, were not members of the Consolidated Tax Group and were not included in the consolidated federal returns. During the same period, WMI filed consolidated returns on behalf of the Consolidated Tax Group in Oregon as well. The REITS were not included in the consolidated Oregon returns. Thus, the income of the REITS from the REIT loans was not reflected in the consolidated federal or Oregon tax returns.

**3.** Citations to pleadings filed in the bankruptcy case are "D.I. # ."

payment for excise taxes owed by entities other than the Debtors. (D.I. 3196.) Oregon responded that WMI is jointly and severally liable for the excise tax obligations of the WMB Entities under Oregon law. Thereafter, Oregon filed an amended claim (in the same amount as the original claim). The Debtors objected to the amended claim, asserting that the tax was unconstitutional because WMI lacked a substantial nexus with the State of Oregon. (D.I. 9113.) Alternatively, WMI asserted that if the tax is constitutionally permissible, the amount of the claim should be zero.

In its Seventh Amended Plan of Reorganization (the "Plan"), the Debtors designated a liquidating trust to administer the liquidating trust assets and distribute the proceeds thereof. On February 24, 2012, the Plan was confirmed and the Trust was formed. On September 13, 2012, the Trust, as successor in interest to the Debtors, filed its memorandum of law in support of the Debtors' objection to Oregon's claim.

The matter was fully briefed and the Court heard oral argument on the constitutional issue on September 25, 2012. At the conclusion of the hearing, the Court took the matter under advisement. It is ripe for decision.

## II. *JURISDICTION*

The Court has subject matter jurisdiction over this core matter. 28 U.S.C. §§ 1334(b) & 157(b)(2)(A) & (B).

## III. *DISCUSSION*

### A. *Oregon Corporate Excise Tax*

Oregon argues that, pursuant to Oregon law, WMI is liable for the Oregon excise tax owed by its subsidiaries. Oregon asserts that WMI, as the parent holding company of its. unitary business, filed consolidated corporate tax returns on behalf of itself and its operating subsidiaries for the Taxable Period. The Oregon tax laws provide in relevant part:

(1) Generally, the consolidated return shall be filed by and in the name of the common parent corporation. If the common parent is not a member of the affiliated group filing the consolidated Oregon return or is not subject to Oregon taxation, the return shall be filed in the name of a member of the affiliated group doing business in Oregon as defined under ORS 317.010(4). If more than one member is doing business in Oregon, the name of the member having the greatest presence in Oregon shall be used.

Or. Admin. R. 150–317. 710(5)(a)–(A) (2012).

Oregon argues that if WMI was not subject to taxation by Oregon, the return should not have been filed in its name and WMI should not have been included in the consolidated tax group. Oregon asserts, therefore, that by filing the return in its name, WMI admitted that it was doing business in Oregon and was liable for the excise tax. Oregon seeks to impose joint and several liability upon WMI because it was included in the consolidated state tax return.

The corporation's tax liability shall be joint and several with any other corporation that is included in a consolidated state return with the corporation under subsection (5) of this section.

Or.Rev.Stat. § 317.710(2) (2012).

The Trust responds that the mere inclusion of WMI in the consolidated tax return is not a concession or admission of its tax liability. *See, e.g., Estee Lauder Serv., Inc. v. Dep't of Revenue*, 16 Or. Tax 279, 284, 2000 WL 33225378 (Or.T.C.2000) (holding that members of an affiliated group are not treated as a single taxpayer

for the purpose of determining whether any member is subject to tax); *State ex rel. Dep't of Revenue v. Penn Indep. Corp.*, 15 Or. Tax 68, 74, 1999 WL 1062130 (Or. T.C.1999) (holding that the inclusion of income by a nontaxable member of a unitary group does not subject that income to taxation of the group). In fact, the Trust notes that WMI was required to be included in the Oregon tax return because it was part of the consolidated group for federal tax purposes. Or.Rev.Stat. § 317.710(2) (2012) ("If [a] corporation is a member of an affiliated group of corporations making a consolidated federal return, it shall file a return and determine its Oregon taxable income as provided in ORS 317.715.").

The Trust further contends that if WMI is liable under Oregon tax law, that tax is unconstitutional.

### B. *Constitutionality of Tax*

■ A state's power to tax a particular taxpayer is limited by both the Due Process and Commerce Clauses of the United States Constitution. *Quill Corp. v. North Dakota*, 504 U.S. 298, 305, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992); *Mobil Oil Corp. v. Comm'r of Taxes of Vt.*, 445 U.S. 425, 449, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980); *Nat'l Bellas Hess, Inc. v. Dep't of Revenue*, 386 U.S. 753, 756, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), overruled in part on other grounds, *Quill*, 504 U.S. at 308, 112 S.Ct. 1904.

The Trust argues that the tax is unconstitutional because it (i) is incompatible with the Due Process Clause and (ii) violates the Commerce Clause.

#### 1. *Due Process*

■ Due process requires (1) "some minimum connection, between a state and the person, property or transaction it seeks to tax," and (2) that "income attributed to the State for tax purposes must be rationally related to values connected with the taxing State." *Quill*, 504 U.S. at 306, 112 S.Ct. 1904. Due process is not satisfied unless, in addition to finding "minimum contacts," the court determines that the income a state seeks to tax relates to a benefit received from the state. *Id.* at 308, 112 S.Ct. 1904. The initial inquiry regarding due process, therefore, is "whether a defendant had minimum contacts with the jurisdiction such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Quill*, 504 U.S. at 307, 112 S.Ct. 1904 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

#### a. *Minimum contacts*

■ The Trust contends that WMI did not purposefully avail itself of the benefits of Oregon because WMI's primary business offices were located in Seattle, Washington, and it did not operate any offices or own any other property in Oregon. Further, the Trust argues that WMI conducted no business activity within or directed towards Oregon and received no sales or other operating revenue of any kind from Oregon sources. The Trust asserts that WMI was merely a holding company and that WMB did not represent WMI, nor act on WMI's behalf, in its business dealings within Oregon. *See, e.g., Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F.Supp. 1458, 1471–72 (D.Del. 1991) (holding that the ownership of a Delaware subsidiary in the taxing state, standing alone, does not qualify as a continuous and systematic contact to meet the due process requirements of minimum contacts); *Afros S.p.A. v. Krauss–Maffei Corp.*, 624 F.Supp. 464, 468 (D.Del.1985) (holding that the continuous incorporation of a subsidiary in the taxing state and the filing of annual franchise tax returns are insufficient minimum contacts of the holding company).

Oregon argues that WMI, through its banking subsidiaries, was doing business in Oregon. Oregon asserts that WMI directly controlled its banking subsidiaries (the WMB Entities) all of which were indisputably doing business and earning income on behalf of WMI and themselves in Oregon during the Taxable Period.

In the case at bar, the Court agrees with the Trust that the Due Process Clause bars enforcement of the Oregon tax because WMI and WMB were separate legal entities and because WMI conducted no business activity within or directed towards Oregon. WMI was simply a parent holding company that held stock in its subsidiaries. Its only source of income related to Oregon came from cash dividends from the WMB Entities. Oregon is not seeking to tax WMI on those dividends;[4] rather it is seeking to impose a corporate excise tax on WMI for the income earned by its subsidiaries who were doing business in Oregon. In the absence of piercing the corporate veil, the Court finds no precedent that would allow Oregon to tax a nondomiciliary corporate parent (or shareholder) for the separate income of its subsidiary.

### b. *Benefits received from activities in State*

In addition, Oregon argues that intellectual property of WMI was utilized in Oregon during the Taxable Period by its subsidiaries. For example, Oregon contends that the WMB Entities utilized trademarks owned by WMI, such as the "Power of Yes" slogan. Oregon asserts that such intellectual property constitutes a profit-seeking activity conducted on behalf of WMI by its subsidiaries which resulted in a benefit to WMI (in the form of increased goodwill and cash dividends from the subsidiaries to WMI).

■ A State may only tax a nondomiciliary corporation on its own interstate business provided there is a "minimal connection or nexus between the interstate activities and the taxing State, *and* a rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Exxon Corp. v. Wis. Dep't of Revenue*, 447 U.S. 207, 219–20, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980) (emphasis added) (internal citations omitted). Here, WMI's only connection to Oregon was the use of its intellectual property by its subsidiaries. That connection, however, is not sufficient because WMI received no benefit because it did not earn any income from the use of its intellectual property. In order to impute the use of the intellectual property by the subsidiary to the parent company for due process purposes, the parent company must derive substantial revenues from that intellectual property. *See, e.g., Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1271 (Fed.Cir.1998) (holding that a subsidiary's contact in the forum state was imputed to the parent company for due process purposes where the parent derived substantial licensing revenues from the subsidiary's sales in the taxing state); *Geoffrey, Inc. v. South Carolina Tax Com'n*, 313 S.C. 15, 437 S.E.2d 13, 17 (1993) (holding that an out-of-state trade-

---

4. When a nondomiciliary corporation having no other connection with the state receives dividends from a subsidiary doing some business within the state, the state may not constitutionally tax the dividend income unless the recipient taxpayer corporation and its underlying subsidiary payor were engaged in a unitary business. *See generally, Container Corp.* *of America v. Franchise Tax Bd.*, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983); *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982); *Mobil Oil Corp. v. Comm'r of Taxes of Vt.*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980).

mark holding company was subject to the state's taxing jurisdiction because it earned income based on the franchise activities in the state).

Thus, the Court finds that WMI did not have sufficient minimum contacts with Oregon and the Oregon tax is not "rationally related to values connected with the taxing State." *See Quill,* 504 U.S. at 306, 112 S.Ct. 1904. Therefore, the Court will sustain the Trust's Objection to the Oregon tax, as violative of the Due Process Clause of the U.S. Constitution.

### 2. *Commerce Clause*

■ Alternatively, the Trust asserts that the Oregon excise tax violates the Commerce Clause. By specifically delegating to Congress the power "to regulate Commerce . . . among the several States," the Commerce Clause implicitly prohibits the states from taking actions that interfere with interstate commerce. U.S. Const. Art. 1, § 8, cl. 3. *See Quill,* 504 U.S. at 309, 112 S.Ct. 1904. However, the prohibition does not render impermissible all state taxation of interstate commerce. A state can survive a Commerce Clause challenge if the "tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state." *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

The Trust's Commerce Clause challenge to the constitutionality of the Oregon excise tax focuses solely on the first prong of the *Complete Auto* test, namely whether WMI's activities had a "substantial nexus" with the State of Oregon. The parties, however, dispute which standard is applicable in determining a substantial nexus under these circumstances.

■ The Supreme Court has made clear that substantial nexus requires far more that a slight presence in the taxing state. *See Quill,* 504 U.S. at 315, n. 8, 112 S.Ct. 1904 ("expressly reject[ing] a slighted presence standard of constitutional nexus") (internal citations omitted). "While the concept of substantial nexus is more elastic than ·physical presence, it plainly means a greater presence, both qualitatively and quantitatively, than the minimum connection between a State and a taxpayer that would satisfy a due process inquiry." *Capital One Bank v. Comm'r of Revenue,* 453 Mass. 1, 899 N.E.2d 76, 86 (2009).

■ In contrast to the Due Process Clause nexus inquiry which centers on the fundamental fairness of the governmental activity upon the "individual," the Commerce Clause and its nexus requirement focus on "the effects of state regulation on the national economy." *Quill,* 504 U.S. at 312, 112 S.Ct. 1904. *See also, Bellas Hess,* 386 U.S. at 760, 87 S.Ct. 1389 (noting that "[t]he very purpose of the Commerce Clause was to ensure a national economy free from . . . unjustified local entanglements"). Despite the similarity of phrasing, the Court in *Quill* expressly rejected the contention that the "minimum contacts" nexus requirement of the Due Process Clause and the "substantial nexus" requirement under the Commerce Clause were equivalent. The Court opined that unlike the Due Process "minimum contacts" nexus analysis, the "substantial nexus" requirement for Commerce Clause purposes is not "a proxy for notice," but instead a means of limiting the burdens which a state may impose upon interstate commerce. *Quill,* 504 U.S. at 313, 112 S.Ct. 1904. Courts have developed different analyses for determining whether a taxpayer has a substantial nexus with the State to permit it to be taxed.

### a. *Physical Presence Doctrine*

The Trust first argues that it lacked any relevant physical presence in Oregon to be constitutionally taxed in accordance with the bright-line physical presence standard articulated in *Bellas Hess* and *Quill*. *See, e.g., Quill*, 504 U.S. at 317, 112 S.Ct. 1904 (holding that physical presence was a necessary requirement for establishing a substantial nexus under the Commerce Clause); *Bellas Hess*, 386 U.S. at 756, 87 S.Ct. 1389 (holding that to find a substantial nexus exists, courts examine the level of a taxpayer's "presence" within the taxing state).

Oregon responds that the *Quill* Court established a bright-line physical presence requirement only with respect to sales and use taxes and not corporate excise tax. In *Quill*, the Supreme Court considered whether an out-of-state mail-order house that had neither outlets nor sales representatives in North Dakota could be required to collect and pay a use tax on goods purchased by North Dakota residents for use in that State. *Quill*, 504 U.S. at 301, 112 S.Ct. 1904. The Supreme Court held that North Dakota's attempt to tax an out-of-state entity that lacked any physical presence in the State violated the Commerce Clause. *Id.* at 303, 112 S.Ct. 1904. Several courts have held that *Quill* is limited to sales and use taxes and does not apply to the imposition of other state taxes such as corporate excise or income taxes. *See, e.g., Lamtec Corp. v. Dep't of Revenue*, 151 Wash.App. 451, 215 P.3d 968, 974 (2009) (holding that physical presence is not required for a business and occupation excise tax); *Tax Comm'r of the State of W.Va. v. MBNA Am. Bank, N.A.*, 220 W.Va. 163, 640 S.E.2d 226, 232 (2006) (holding that "*Quill's* physical-presence requirement for showing a substantial Commerce Clause nexus applie[d] only to use and sales taxes and not to business fran-

chise and corporation net income taxes"); *A & F Trademark, Inc. v. Tolson*, 167 N.C.App. 150, 605 S.E.2d 187, 195 (2004) (holding that physical presence is not the sine qua non of a state's jurisdiction to tax under the Commerce Clause for purposes of income and franchise tax); *Geoffrey*, 437 S.E.2d at 18–19 (holding that the physical presence requirement of *Quill* has not been extended to other types of taxes such as taxes on royalty income).

The Trust responds that the value of a bright-line test and the principles of stare decisis mandate the application of that test here. *See Quill*, 504 U.S. at 317, 112 S.Ct. 1904 (recognizing that although the physical-presence rule, like all bright-line rules, "appears artificial at its edges," the artificiality was offset by the benefits of a "clear rule"). Oregon replies that the bright-line physical presence test "makes little sense in today's world" where, for example, "electronic commerce now makes it possible for an entity to have a significant economic presence in a state absent any physical presence there." *MBNA*, 640 S.E.2d at 234.

The Court agrees with Oregon. The majority in *Quill* noted that "we have not, in our review of other types of taxes, articulated the same physical-presence requirement that *Bellas Hess* established for sales and use taxes." *Quill*, 504 U.S. at 314, 112 S.Ct. 1904. Thus, the Court concludes that the Oregon corporate excise tax is not unconstitutional simply because WMI lacked a physical presence in Oregon.

### b. *Economic Presence Theory*

Oregon contends that the substantial nexus standard is met in this case by the "economic presence" of WMI in the state. *See, e.g., Griffith v. ConAgra Brands, Inc.*, 229 W.Va. 190, 728 S.E.2d 74, 81–82 (2012) (holding that the "significant economic presence test" is the proper test for determining whether or not a substantial nexus

exists under the Commerce Clause); *MBNA,* 640 S.E.2d at 234 (holding that the significant economic presence test is an appropriate measure because, unlike the Due Process analysis, the Commerce Clause is more concerned with whether a state-imposed tax unduly burdens interstate commerce or affects the national economy); *Am. Refrigerator Transit Co. v. Tax Comm'n,* 238 Or. 340, 395 P.2d 127, 131 (1964) (holding that "[t]o establish nexus it is necessary to show that the taxpayer has, in the conduct of his business, taken advantage of the economy of the taxing state to produce the income which is subject to tax").

The Court in *MBNA* explained the rationale for the "significant economic presence" test:

> Rather than a physical presence standard, this Court believes that a significant economic presence test is a better indicator of whether substantial nexus exists for Commerce Clause purposes.... [A] substantial economic presence standard incorporates due process purposeful direction towards a state while examining the degree to which a company has exploited a local market. Further, a substantial economic presence analysis involves an examination of both the quality and quantity of the company's economic presence. Finally, under this test, purposeful direction towards a state is analyzed as it is for Due Process Clause purposes, and the Commerce Clause analysis requires the additional examination of the frequency, quantity and systematic nature of a taxpayer's economic contacts with a state.

640 S.E.2d at 234 (internal citations omitted).

The Trust asserts that Oregon's argument fails because it is based only on state court decisions when Supreme Court and other federal court decisions are control-

ling with respect to constitutional issues. *See, e.g., Sw. Offset, Inc. v. Hudco Publ'g Co.,* 622 F.2d 149, 152 (5th Cir.1980) (holding that the court was not bound by a ruling of the Texas Supreme Court on the Due Process Clause of the U.S. Constitution); *Indus. Consultants, Inc. v. H.S. Equities, Inc.,* 646 F.2d 746, 749 (2d Cir.1981) (holding that, in construing the constitutionality of certain tolling provisions, the "district court was not bound to adopt the Oklahoma court's interpretation of federal constitutional principles, even as applied to [the] Oklahoma statutes"). The Trust argues that the federal requirements for substantial nexus are clearly delineated by federal precedent and the state court rulings favoring the significant economic presence test do not supplant such requirements. *See, e.g., Laptops Etc. Corp. v. D.C. (In re Laptops Etc. Corp.),* 164 B.R. 506, 521 (Bankr.D.Md.1993) (holding that the "slightest presence" standard as well as the "economic presence" standard for constitutional nexus has been expressly rejected).

■■■ The Court acknowledges that the significant economic presence test has not been formerly endorsed by the Supreme Court. The Court concludes that constitutionality of the Oregon excise tax is not determined by *Quill's* physical presence test or the state courts' significant economic presence test, but by the "substantial nexus" test articulated in *Complete Auto.* The Court agrees with Oregon, however, that the economic presence of WMI in Oregon is a factor to be considered in determining whether WMI possessed a substantial nexus with Oregon.

### c. *Application of Complete Auto*

■■■ In applying the *Complete Auto* test, Oregon argues that WMB acted as an agent for WMI in Oregon because WMI maintained control over its subsidiaries.

Oregon asserts that WMI had the power to sell any of the Oregon assets at any time and make any other changes to the business that it chose. In support of its argument, Oregon asserts that the January 16, 2011, WMI Board of Directors Minutes evidence that WMI maintained the WMI Balance Pension Plan, the WMI Employees' Stock Purchase Plan, and the WMI Retirement Savings and Investment Plan for the benefit of employees of WMI and its subsidiaries. Also, the WMI Board resolved that no officer of WMI or any of its subsidiaries including WMB would have authority to participate in the major policy-making functions of the group other than certain WMI officers.

The Trust responds that WMI's ownership of its subsidiaries did not amount to a substantial nexus with Oregon because WMI did not make business decisions on behalf of WMB other than to set general policy, and WMB operated independently of its corporate parent. The Trust contends that WMI merely held stock in its subsidiaries and the extent of WMI's operations was simply to monitor its investments.

Oregon also argues that while WMI may not have had a physical presence in Oregon, its intangible property (trade name and trademarks) clearly had a sufficient connection with Oregon to support the imposition of a corporate excise tax. WMI, not WMB, is the owner of all of the trademarks and the goodwill represented by them, including but not limited to the marks "WAMU," "Washington Mutual," and the "W Logo" for a variety of services including but not limited to banking, credit card, lending, investment, financial services, community, education, and philanthropic-oriented services. WMI also owns at least 140 secondary trademarks and service marks and approximately 1350 domain names which contain the trademarks including wamu.com and washingtonmutual.com. Oregon argues that these permitted the subsidiaries to advertise and provide information to customers regarding the products and services relevant to the subsidiaries' business all of which increased the goodwill of WMI. *See, e.g., Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank,* 696 F.2d 1371, 1375 (Fed.Cir. 1982) ("Unlike patents or copyrights, trademarks are not separate property rights. They are integral and inseparable elements of the goodwill of the business or services to which they pertain."); *Marshak v. Green,* 746 F.2d 927, 929 (2d Cir. 1984) (holding that a trade name or mark "is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes").

Oregon relies on *New York ex rel. Whitney v. Graves,* in which the Supreme Court rejected a Commerce Clause challenge to the taxation of profits made on the sale of a seat on the New York Stock Exchange. 299 U.S. 366, 374, 57 S.Ct. 237, 81 L.Ed. 285 (1937). The *Graves* Court considered the taxpayer's assertion that he and his partners were neither residents of New York nor physically present in New York to transact business. *Id.* at 371, 57 S.Ct. 237. The Court held, however, that an intangible may be sufficiently localized "to bring it within the taxing power" of the state and upheld the tax. *Id.* at 374, 57 S.Ct. 237.

The Trust responds that the facts of this case bear no resemblance to the facts of *Graves.* The Court agrees. Here, Oregon is not seeking to tax the proceeds of any sale in Oregon of an intangible owned by WMI or the proceeds of the licensing of any intellectual property owned by WMI that was used in connection with business activity in Oregon. Rather, Oregon is attempting to hold WMI jointly and severally liable for corporate excise taxes in-

curred by the banking operations of its subsidiaries in Oregon. Thus, the Court concludes that *Graves* is inapplicable.

Oregon also argues that the Supreme Court has upheld a State's power to impose an income tax on dividends received by out-of-state stockholders from an in-state corporation. *Int'l Harvester Co. v. Wis. Dept. of Taxation,* 322 U.S. 435, 437, 64 S.Ct. 1060, 88 L.Ed. 1373 (1944). The Court held that "the fact that the stock-holder-taxpayers never enter Wisconsin ... cannot deprive it of its jurisdiction to tax. It has never been thought that residence within a State or country is a sine qua non of the power to tax." *Id.* at 443, 64 S.Ct. 1060. In its reasoning, the Court stated that the State of Wisconsin provided "protection and benefits to [the subsidiary's] corporate activities and transactions within the state" and these activities "g[ave] rise to the dividend income of [the subsidiary's] stockholders...." *Id.* at 442, 64 S.Ct. 1060.

The Court in *International Harvester,* however, was considering a challenge to the tax under the Due Process Clause and not the Commerce Clause. *See KFC Corp. v. Iowa Dep't of Revenue,* 792 N.W.2d 308, 325 (Iowa 2010) (acknowledging that *International Harvester* and *Graves* were due process cases and "were decided at a time when the nexus requirements of the Due Process and the ... Commerce Clause were thought to be interchangeable"). The Supreme Court has since acknowledged that it has not always been precise in distinguishing between the Commerce Clause and the Due Process Clause and emphasized that the two are analytically distinct. *Quill,* 504 U.S. at 305, 112 S.Ct. 1904. The Supreme Court suggested: "Although the two motions cannot always be separated, clarity of consideration and of decision would be promoted if the two issues are approached, where they are pre-

sented, at least tentatively as if they were separate and distinct, not intermingled ones." *Id.* at 306, 112 S.Ct. 1904 (internal citations omitted). In *International Harvester,* the Supreme Court made no reference to the Commerce Clause or its requirements for substantial nexus. Thus, the Court concludes that *International Harvester* does not provide any basis for limiting the scope of the substantial nexus requirement established by *Complete Auto* and *Quill* as it relates to the Commerce Clause.

In addition, the Court finds *International Harvester* is factually distinguishable. That case involved a tax levied on the stockholder's own dividend income. As noted above, Oregon is not seeking to tax the dividend income received by WMI. Rather, Oregon is seeking to hold WMI liable for the tax liabilities that arose exclusively from the Oregon activities of WMI's subsidiaries. Again, Oregon relies on the fact that WMI's trademarks were used by the WMB Entities in Oregon to support its claim of a substantial nexus with the State. The majority of courts to address this issue, however, have found a substantial nexus for Commerce Clause purposes only when the intangible property itself generated income for the taxpayer. *See, e.g., Geoffrey, Inc. v. Comm'r of Revenue,* 453 Mass. 17, 899 N.E.2d 87, 92 (2009) (holding that licensing agreements that provided substantial royalty income for the use of licensor's trademarks satisfied the substantial nexus test); *Sec'y, Dep't of Revenue v. Gap (Apparel), Inc.,* 886 So.2d 459, 462 (La.Ct.App.2004) (holding that tax on royalties based on the net sales of the licensed products was constitutional); *Lanco, Inc. v. Dir. Div. of Taxation,* 379 N.J.Super. 562, 879 A.2d 1234, 1242 (Ct.App.Div.2005) (holding that taxation of income derived from licensing agreement with company conducting retail operations in State was constitutional);

*Geoffrey,* 437 S.E.2d at 19 (holding that tax imposed on income derived from license fee met the substantial nexus test); *A & F Trademark,* 605 S.E.2d at 195 (holding that a substantial nexus exists where the out-of-state company earns income from licensing trademarks to related in-state retail company).

In the case at bar, WMI did not receive any royalty payments, license fees, or any other income from the WMB entities' use of WMI's intellectual property. Therefore, unlike the cases cited above, WMI did not realize a quantifiable benefit from the use of its intangible property in the State of Oregon. Nor is Oregon seeking to tax only royalty income; it is seeking to impose an excise tax on WMI for its subsidiaries' operations in Oregon. Under Oregon's analysis, any shareholder who receives thousands (or less) in dividends from a subsidiary would be responsible for potentially millions in taxes incurred by that subsidiary. Such a result would have devastating consequences to shareholders and to the United State's economy where investments play a crucial role. The effect of finding a parent holding company liable for the corporate excise tax of its subsidiaries merely because it allowed the free use of its trademarks and received a dividend would deeply burden interstate commerce. For these reasons, the Court concludes that WMI did not have a substantial nexus with Oregon as required by the Commerce Clause.

Accordingly, the Court will also sustain the Trust's Objection to Oregon's claim on the basis that it violates the Commerce Clause of the U.S. Constitution.

## IV. *CONCLUSION*

For the foregoing reasons, the Court will sustain the Trust's Objection to Oregon's claim on the bases that it violates the

Due Process and Commerce Clauses of the U.S. Constitution.

An appropriate Order is attached.