IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Corporation Excise Tax

TIME WARNER, INC. and SUBSIDIARIES,  )
 )
        Plaintiff,       )  TC-MD 220337N
 )
     v.            )
 )
DEPARTMENT OF REVENUE,     )  **ORDER GRANTING DEFENDANT'S**
State of Oregon,            )  **MOTION FOR PARTIAL SUMMARY**
                         )  **JUDGMENT IN PART, DENYING**
        Defendant.    )  **PLAINTIFF'S CROSS-MOTION**

This matter comes before the court on the parties' Cross-Motions for Partial Summary

Judgment.[1]  For the 2011 to 2013 tax years, the parties dispute two issues: (1) whether Plaintiff

or any of its affiliates were "broadcasters" for purposes of the special apportionment formula in

ORS 314.680 to 314.690,[2] and (2) whether Plaintiff or any of its affiliates has "substantial

nexus" with Oregon under both the Due Process Clause of the 14th Amendment to the United

States Constitution and the Commerce Clause of the United States Constitution.  (Ptf's MPSJ at

3; Def's MPSJ at 1.)  If Plaintiff does not prevail on those issues, Plaintiff claims Defendant's

"proposed adjustments have resulted in an apportionment of income to Oregon which does not

fairly represent the extent of [Plaintiff's] business activities in the State" under ORS 314.670.

(Ptf's MPSJ at 3.)

## I.  STATEMENT OF FACTS

Plaintiff, a Delaware corporation, is "a leading media and entertainment company" with

"four reportable segments: (1) Turner, consisting principally of cable networks and digital media

---

[1] Oral argument held in Tax Court courtroom on July 11, 2024.

[2] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to 2009.

properties; (2) Home Box Office [HBO], consisting principally of premium pay television services domestically and premium pay and basic tier television services internationally; (3) Warner Bros., consisting principally of feature film, television, home video and videogame production and distribution; and (4) Time Inc., consisting principally of magazine publishing and related websites and operations." (Ptf's MPSJ at 1, 4; Ptf's Ex 1 at 3 (10-K); Def's MPSJ at 2.) Plaintiff's affiliated group included more than 100 separate corporations. (Decl of Kerri Clark at 4.) At audit, Defendant determined the following network affiliates were broadcasters and applied the special formula to source their receipts: HBO, TBS, CNN, Courtroom TV, Cartoon Network, Turner Classic Movies (TCM), and Turner Network Television (TNT).[3] (*See* Ptf's MPSJ at 1; Ptf's Resp at 1; Decl of Clark at 1.) This Order focuses on those seven networks because they are the entities for which facts were developed and presented to the court.

A.      *Overview of Seven Networks*

The seven networks each "distributed different cable programming networks through third party cable and satellite distributors and cable television systems." (Decl of Clark at 1.) HBO is "a premium cable television network and was not ad supported." (*Id.*) It generated revenue from cable customers who subscribed to HBO. (*Id.*) The remaining Turner networks "were all ad supported." (*Id.* at 1-2.)

Plaintiff makes numerous assertions related to the disconnect between the seven networks and Oregon viewers based on Plaintiff's third-party affiliation agreements with "cable and

---

[3] Plaintiff further alleges that Defendant "erroneously applied the special apportionment formula for interstate broadcasters to all members of Time Warner's consolidated return group." (Ptf's MPSJ at 8.) As discussed in more detail in the Order's Analysis, this court recently clarified that the applicable apportionment formula is determined at the entity level and, accordingly, that the special broadcaster formula applies only to those entities that were broadcasters, not the entire affiliated group. *See generally ABC v. Dept. of Rev.*, TC 5431, 2024 WL 2146943 (Or Tax 2024). Defendant acknowledges the impact of that ruling but continues to assert that more, or perhaps all, of Plaintiff's affiliates were broadcasters. (Def's Resp at 11-12.)

satellite distributors and cable television systems." (Decl of Clark at 1.) For instance, Plaintiff asserts that the networks "had no privity of contract" with "Oregon residents or customers" and "did not collect revenues" from them. (*Id.* at 3.) Nor did they "receive any income from the licensing of intangible property in Oregon." (*Id.* at 2.) The seven networks "did not transmit their programming content or otherwise broadcast to Oregon viewers." (*Id.* at 4.) Rather, Plaintiff's third-party affiliates did those things. (*See id.* at 2-4.) The seven networks "uplinked their programming content from outside Oregon to a satellite located outside the State." (*Id.* at 3.) The distributors then downlinked the programming and transmitted it to subscribers. (*Id.*)

The seven networks received income attributable to Oregon audiences or subscribers pursuant to the third-party affiliation agreements: $40 million in each year for HBO and $60 to $70 million each year for the ad-based Turner networks. (Def's MPSJ at 2; Def's Resp at 4-5.[4]) Oregon subscribers comprised a portion of the total subscribers as follows:

|  | TBS | CNN | TNT | Cartoon | TCM | Court | HBO |
|---|---|---|---|---|---|---|---|
| **2011** | 1.0086% | 0.9980% | 1.0280% | 0.8332% | 0.7169% | 1.0635% | 1.12% |
| **2012** | 0.9988% | 0.9686% | 1.0056% | 0.7975% | 0.7375% | 1.0629% | 1.10% |
| **2013** | 0.9818% | 0.9755% | 1.0048% | 0.7878% | 0.7603% | 1.0850% | 1.07% |

(Def's Exs D-G.)

None of the seven networks had employees, offices, or real or tangible personal property in Oregon. (Decl of Clark at 2.) They did not sell or otherwise provide equipment to Oregon customers or residents. (*Id.* at 3.) The networks "did not own an FCC license granting a designated market area to broadcast in Oregon." (*Id.*) However, they were subject to FCC

---

[4] Defendant used both "audience" and "subscriber" throughout its briefing and perhaps interchangeably. (*See, e.g.,* Def's MPSJ at 10-11 (stating HBO requires Comcast "to track HBO's audience down to the individual subscriber level"). Plaintiff similarly seems to use the terms interchangeably, while denying that its networks had either. (*See, e.g.,* Ptf's MPSJ at 7 (stating the networks "did not transmit their programming content or otherwise broadcast to Oregon viewers. The third-party distributors broadcasted to their Oregon subscribers and audience"). Accordingly, the court uses both terms, though the affiliation agreements largely use the term "subscriber."

regulations, "either directly or indirectly through their distribution partners[.]" (Ptf's Ex 1 at 21.) None of the affiliates sent "any solicitations for business to Oregon residents or customers." (Decl of Clark at 2.) However, "HBO incurred approximately $300 million in marketing expenditures" for nationwide advertising during the tax years at issue, including cable and internet advertising that indisputably reached Oregonians. (*See* Def's Ex J at 1-2.)

Given the importance of the third-party affiliation agreements to the parties' positions, the court recites additional facts relating to the seven networks' business models and their affiliation agreements under which they received the income at issue in this case.

B.      *HBO's Affiliate Agreements*

HBO's "businesses consist principally of premium pay television services" including the "multi-channel HBO and Cinemax" services operated by HBO. (Ptf's Ex 1 at 8.) HBO "generates revenues principally from providing programming to domestic affiliates that have contracted to receive and distribute such programming to their customers who choose to subscribe to the premium pay television services." (*Id.*) It is "the most widely distributed domestic multi-channel premium pay television service" with 43 million domestic premium pay subscribers in 2013. (*Id.* at 8-9.) HBO also generates revenue "from the exploitation of its original programming through multiple distribution outlets." (*Id.* at 9.)

During the tax years at issue, HBO had an affiliation agreement with Comcast that granted Comcast the right to market, transmit, and subdistribute HBO and Cinemax television programming. (Ptf's Ex 3 at 1-2.) Under the agreement, HBO sent Comcast "a video and audio signal" via domestic satellite "used for transmission of cable television programming * * *." (*Id.* at 16-17.) Comcast maintained, at its own expense, a "suitable facility" to receive the programming. (*Id.* at 17.) All programming decisions were within the sole discretion of HBO,

and Comcast was required to distribute programming in its entirety, exactly as delivered by HBO and without any modifications. (*Id.* at 18.)

Comcast was required to pay HBO "a monthly service charge" for each HBO and Cinemax subscriber. (Ptf's Ex 3 at 27.) If Comcast reduced a subscriber's bill due to failure of transmission of HBO programming, then Comcast could make a pro rata reduction in its service charge due to HBO. (*Id.* at 28.) Comcast was required to "keep accurate and complete records and accounts of billings [and] subscribers" and to send to HBO monthly a statement of the total number of HBO and Cinemax subscribers for which services charges were due. (*Id.* at 45-46.) A "List of Systems" was attached to the affiliate agreement, which reflected "Qualifying Systems" carrying HBO programming and subject to the agreement. (*Id.* at 5, 57-71.) The list includes the following Oregon locations: Corvallis regional, Eugene regional, East Portland regional, Linn County regional, McMinnville regional, Salem regional, St Helens regional, Tualatin Valley regional, and West Portland regional. (*Id.* at 57-71.)

Comcast agreed to actively market HBO programming to increase the number of subscribers. (Ptf's Ex 3 at 44.) To aid that effort, HBO provided Comcast with millions of dollars in matching funds to cover Comcast's marketing expenses during the contract period. (*Id.* at 45.) HBO agreed to provide closed captioning to ensure Comcast complied with FCC and other federal law. (*Id.* at 16.) HBO also agreed to coordinate with Comcast to comply with any applicable state or local laws. (*Id.*) HBO permitted Comcast to use its trademarks and logos in programs guides, listings, bill stuffers, and similar materials. (*Id.* at 38-39.) HBO agreed to indemnify and hold Comcast harmless for any claim "arising out of or caused by its distribution in accordance with this Affiliation Agreement of any programming," including libel, slander, copyright infringement, or right of privacy. (*Id.* at 47.) The agreement provided that no Comcast

subscriber "shall be deemed to have any direct or indirect contractual relationship with HBO or any other direct relationship with HBO by virtue of" the agreement. (*Id.*)

C.       *Turner Networks' Affiliate Agreements*

"Turner generates revenues principally from providing programming to cable system operators, satellite service distributors, telephone companies and other distributors (known as affiliates) that have contracted to receive and distribute this programming to subscribers and from the sale of advertising." (Ptf's Ex 1 at 3.) Fee arrangements under the affiliate agreements "are generally related to the number of subscribers served by the affiliate, the package of programming provided to the affiliate by each network and the competitive market." (*Id.* at 4.) Turner sells consumer advertising on a national basis and receives revenue based on the size and demographics of audience reach. (*See id.*) Turner networks – including TBS, TNT, TCN, and others – reached between 90.8 and 98.6 million US television households in 2013. (*Id.* at 5.)

During the tax years at issue, Turner had an affiliation agreement with the National Cable Television Cooperative (NCTC) for the distribution of Turner networks' programming. (Def's Ex H at 350.[5]) NCTC negotiates programming agreements with members that own and operate cable television systems. (*Id.*) The members received a nontransferable license to distribute Turner network programming to "subscription television customers" nationwide. (*Id.* at 350-353.) Turner transmitted programming via satellite. (*Id.* at 358.) The members were required to cablecast Turner's programming "in its entirety, displayed full screen, on a single dedicated channel, dedicated to and used solely for the full-time delivery of such [programming], without any editing, delay, additional, alternation, deletion or interruption * * *." (*Id.* at 355.)

---

[5] The agreement was by Turner Network Sales, which "transmits the satellite-delivered video programming services" including CNN, TNT, TBS, Cartoon Network, and TCM. (Def's Ex H at 350.)

NCTS was required to pay Turner on behalf of its members a monthly rate for each network, and to provide Turner with reports of subscriber information for the preceding month, listing subscribers by network. (Def's Ex H at 359-361.) Service addendums to the agreement authorized members to advertise in specified time blocks per hour (*e.g.*, one, two, or three minutes) with a monthly rate per subscriber. (*Id.* at 375-377.) The monthly rates varied depending on the total subscribers to the network. (*See id.*) Additional provisions limited the permissible advertisements that could be inserted into programming by members, such as advertising appropriate for children on Cartoon Network. (*Id.* at 355-56.)

The agreement included a provision stating that it did not create a "joint venture, partnership or agency relationship between the parties" and that no "privity of contract" existed between a member's customer and Turner by virtue of the agreement. (Def's Ex H at 364.)

## II. ANALYSIS

As noted above, the issues presented are whether Plaintiff or any of its affiliates were interstate broadcasters subject to the special apportionment provisions contained in ORS 314.680 to 314.690 and, if so, whether those broadcaster affiliates had substantial nexus with Oregon as defined by state law and under the United States Constitution's Due Process Clause of the 14th Amendment and the Commerce Clause. In accordance with the "first things first" doctrine, the court begins with state law claims before addressing federal claims. *See Capital One v. Dept. of Rev.*, 22 OTR 326, 330 (2016).[6] Here, that means the court begins with whether the interstate broadcaster statutes apply to Plaintiff or any of its affiliates.

/ / /

---

[6] Oregon's corporate excise and income taxes extend to the full extent permitted by the federal constitution, so "constitutionality and proper statutory construction are really one issue, turning upon the application of constitutional limitations upon state taxation of interstate commerce." *Id.* at 333.

A.      *Whether the Seven Networks Were Interstate Broadcasters*

Oregon created a special sales factor for interstate broadcasters in 1989.  *Comcast Corp. and Subsidiaries v. Dept. of Rev.*, 363 Or 537, 541, 423 P3d 706 (2018).  An "interstate broadcaster" is "a taxpayer that engages in the for-profit business of broadcasting to subscribers or to an audience located both within and without this state."  ORS 314.680(3).  "Broadcasting" is "the activity of transmitting any one-way electronic signal by radio waves, microwaves, wires, coaxial cables, wave guides or other conduits of communications."  ORS 314.680(1).  This court and the Oregon Supreme Court have written numerous decisions involving the interstate broadcaster statutes at issue here.  A review of those cases provides helpful background and comparisons in considering whether Plaintiff or any of its affiliates were interstate broadcasters.

1.      *Overview of broadcaster cases*

In the first case, *Comcast* challenged the application of the interstate broadcaster statutes because it derived income from internet and voice over internet protocol services in addition to its cable television service.  *Comcast Corp. v. Dept. of Rev.*, 22 OTR 295, 296 (2016).  The court upheld the application of the broadcaster statutes explaining: "The consequence of a taxpayer engaging in any interstate broadcasting is that the numerator of the sales factor for that taxpayer includes 'all gross receipts attributable to this state, with *gross receipts from broadcasting* to be included as specified in subsection (4) of [ORS 314.684].' "  *Id.* at 297, *citing* ORS 314.684(3) (emphasis in opinion).  On appeal, the Oregon Supreme Court considered Comcast's challenge to the scope of the term "gross receipts from broadcasting" and rejected its narrow reading of that phrase, affirming the tax court opinion.  *Comcast Corp.*, 363 Or at 541.[7]

/ / /

_____

[7] Comcast did not challenge the tax court's conclusion that it was an interstate broadcaster.  *Id.*

More recently, Comcast litigated in this court how to calculate the broadcaster formula for its broadcasting activities: "operating television networks and providing cable television service." *Comcast Corp. and Subsidiaries v. Dept. of Rev.*, 24 OTR 250, 265 (2020). Comcast had a total of 29 television networks, including NBC, USA, and CNBC. *Id.* at 262. Programming was transmitted over the air, via cable television to subscribers, or via direct broadcast satellite to subscribers. *Id.* at 263. Comcast's networks generated revenue from two primary sources: license fees and advertising, both of which were dependent on the size of the audience for the network or the number of subscribers. *Id.* The court ultimately accepted Comcast's proposed apportionment using Nielson data to determine the audience for over-the-air broadcasting and then adding subscriber data from cable and satellite broadcasting. *Id.* at 272. The court observed that, "[a]t a high level, the legislature's purpose in enacting ORS 314.680 to 314.690 was to find a way to account for the location of the market in the sales factor of interstate broadcasters." *Id.* at 270.

> "Over the course of the legislative session, the bill was amended to also ensure that a broadcaster based *outside* Oregon would (assuming it had nexus with Oregon) be required to include an amount in its sales factor reflecting the value of the Oregon audience to advertisers, as opposed to having *no* sales attributed to Oregon under the cost-of-performance rules."

*Id.* at 271.

ABC also challenged its status as an interstate broadcaster, arguing among other things that references to "broadcasting" in its 10-Ks had a different meaning than that term as used in statute. *See ABC, Inc. v. Dept. of Rev.*, TC-MD 170364N, 2020 WL 3412334 (Or Tax M Div, Apr 22, 2020.) That court rejected ABC's argument based on the activities of its media networks segment, which included "a domestic broadcast television network, television production and distribution operations, domestic television stations, international and domestic cable networks,

[and] domestic broadcast radio networks and stations." *Id*. at *2, *12 (internal quotation marks omitted). The court noted that ABC networks derived advertising revenue depending on the size and nature of their audiences. *Id.*

On appeal, the Regular Division of this court considered whether "ORS 317.715(3)(b) requires each affiliate to determine its own apportioned percentage of the group's overall income" or rather "that a single percentage must be determined for the group as a whole." *ABC Inc. v. Dept. of Rev.*, TC 5431, 2024 WL 2146943 (Or Tax 2024). If so, then some of ABC's affiliates were "interstate broadcasters" subject to the special formula and others, such as parks, were not. *Id.* The court ultimately concluded that the broadcaster determination must be made at the entity level. *Id.* at *14, *19.

Finally, NBC challenged its status as an interstate broadcaster despite owning and operating news and entertainment television networks and television stations. *NBCUniversal, Inc. v. Dept. of Rev.*, TC-MD 170037R, 2022 WL 3444001 at *1 (Or Tax M Div, Aug 17, 2022). NBC argued that it lacked "privity of contract" or direct subscribers: "they distribute content to independent third parties – cable, satellite, and independently owned television stations located in Oregon – and not directly to persons in Oregon and thus they do not broadcast to Oregonians because there is a third-party break in the distribution chain." *Id.* at *3. The court rejected that argument, observing the plain language of ORS 314.680 required only that a taxpayer engage "in the business of broadcasting"; it did "not require a contractual relationship or privity with the end user." *Id.* Upon reviewing legislative history, the court found that "[t]he legislature was aware that multistate companies like [NBC] were using affiliates to transmit their programming to its citizens and considered them interstate broadcasters." *Id.* at *4.

/ / /

From that review of case law, the court observes that whether an entity was a broadcaster is determined at the level of the entity. However, an entity that engages in both broadcasting and non-broadcasting activities may still be subject to the broadcaster formula. The definition of an "interstate broadcaster" looks to the entity's business, especially whether it derives revenue from subscribers or an audience. Nothing in the plain language of the statute or the legislative history suggests that a broadcaster must have a contractual relationship with its audience. Operating a television network that receives revenue based on the audience size or number of subscribers qualifies as "the business of broadcasting."

2.      *Application of ORS 314.680(3) and case law to seven networks*

Based on the foregoing conclusions about Oregon's broadcaster case law, the seven networks at issue qualify as interstate broadcasters within the meaning of ORS 314.680(3). Under their affiliation agreements, they transmitted programming to viewers nationwide and received income based on the number of subscribers. To the extent that a network engaged in additional activities (*e.g.*, HBO's creation and sale of original programming), that does not alter the conclusion that it was a broadcaster.

Plaintiff resists the conclusion that the networks were broadcasters, describing them as "content providers" and maintaining that they merely transmitted programming to a satellite located outside of Oregon.[8] (Ptf's MPSJ at 2, 25.) The third-party affiliates, not Plaintiff's networks, did the broadcasting. Plaintiff's position ignores the economic reality of the networks' business models, including the extent of control they retained over their programming. Under the affiliation agreements, the networks permitted no modifications to programming except the

---

[8] Plaintiff does not appear to challenge that this qualified as "transmitting any one-way electronic signal" under ORS 314.680(1).

insertion of approved advertising in the case of the Turner networks. Comcast was required to distribute HBO's programming in its entirety, "exactly as delivered by HBO." (Ptf's Ex 3 at 18.) Similarly, the Turner networks' affiliates were required to deliver programming "in its entirety, displayed full screen, on a single dedicated channel, dedicated to and used solely for the full-time delivery of such [programming], without any editing, delay, additional, alternation, deletion or interruption * * *." (Def's Ex H at 355.) Plaintiff's affiliate agreements demonstrate that Plaintiff's business model required delivery of its programming unaltered to viewers, not merely to its affiliates.

Similarly, the networks' revenue under the affiliation agreements was determined based on the number of subscribers to each network, as contemplated by the definition of an interstate broadcaster in ORS 314.680(3). Or, to put it another way, the subscribers were the relevant market. Other aspects of the affiliation agreements reveal the centrality of subscribers to the compensation structure. HBO provided Comcast with a significant amount of matching funds to cover Comcast's expenses of marketing HBO and increasing its subscribers. Comcast was permitted to reduce its payment to HBO pro rata if an HBO subscriber did not receive the programming due to a transmission failure. The Turner networks similarly received payment based on the number of subscribers to the network. Both HBO and Turner required affiliates to maintain and share detailed subscriber records on a monthly basis.

In sum, the business model of Plaintiff's seven networks reveals them to be interstate broadcasters within the meaning of ORS 314.680(3). Plaintiff makes additional arguments why the interstate broadcaster statutes do not apply, which the court considers in the next section.

3. *Plaintiff's other challenges under broadcaster statutes*

Plaintiff argues that the interstate broadcaster statutes do not apply to the seven networks

because: 1) they were not "taxpayers" under ORS 314.680(3); and 2) they had no "income-producing activity in the state" under ORS 314.684(4). (*See* Ptf's MSPJ at 3, 20; Ptf's Resp at 6-7; Ptf's MSJ at 20.) Plaintiff's argument that the networks were not "taxpayers" appears to be coextensive with its argument that they lacked substantial nexus. (*See* Ptf's MSPJ at 20, Ptf's Resp at 7.) Accordingly, the court addresses that argument in a subsequent section.

With respect to Plaintiff's second argument, the language "income producing activity in this state" appears in ORS 314.684, which explains how to determine the sales factor for an interstate broadcaster. *See* ORS 314.684(1). Subsection (4) states in full:

> "Gross receipts from broadcasting of an interstate broadcaster which engages in income-producing activity in this state shall be included in the numerator of the sales factor in the ratio that the interstate broadcaster's audience or subscribers located in this state bears to its total audience and subscribers located both within and without this state."

ORS 314.684(4). Two other broadcaster statutes provide necessary context to understand that language. First, ORS 314.690 states that "[t]he provisions of ORS 314.680 to 314.688 are not intended to change the meaning of the terms 'income-producing activity,' 'sources within this state,' 'business activity' taxable in this state or 'doing business' in this state contained in this chapter or ORS chapter 317 or 318." The term "income-producing activity" is used in ORS 314.665(4), addressing when sales of other than tangible personal property are in this state.[9]

The second relevant broadcaster statute is ORS 314.682, which states:

> "(1) Notwithstanding any provisions of ORS 314.605 to 314.675 to the contrary, ORS 314.680, 314.684 and 314.686 shall apply to the apportionment of the income of an interstate broadcaster."

> "(2) Except as provided in subsection (1) of this section, all other provisions

---

[9] The term "sources within this state" appears in ORS 318.020, imposing a corporate income tax to the extent a corporation is not subject to the excise tax in chapter 317. *See Capital One v. Dept. of Rev.*, 22 OTR 326, 332 (2016) (explaining that "the corporate excise and corporate income tax regimes were intended to operate as one cohesive tax regime" with the corporate income tax only reaching income not already subject to the excise tax). Neither party presented any arguments under ORS 318.020, so the court declines to address here.

of ORS 314.605 to 314.675 shall apply to the apportionment of the income of an interstate broadcaster."

ORS 314.605 to 314.675 are known as the Uniform Division of Income for Tax Purposes Act (UDITPA). *ABC*, 2024 WL 2146943 at *3. In *ABC*, the court considered the relationship between the interstate broadcaster statutes and UDITPA, concluding "the interstate broadcaster statutes are not separate from, nor do they replace, all of UDITPA. An interstate broadcaster must look to many provisions of UDITPA in order to attribute its income to Oregon." *Id.* at *18. However, in accordance with the directive in ORS 314.682(1), the court considered which provisions of UDITPA may be "contrary" to the interstate broadcaster statutes. *Id.* at *15-16. "Certainly, the sales factor statute in UDITPA, ORS 314.665, is largely contrary to the interstate broadcaster statutes, as ORS 314.684(1) and ORS 314.680(4) prescribe a unique ratio-based computation for all gross receipts other than receipts from sales of real or tangible personal property." *Id.* at *17.

Putting all of that together, the court concludes that the legislature intended the phrase "income-producing activity" to have the same meaning as in ORS 314.665(4).[10] However, the legislature did *not* intend to adopt the cost of performance sourcing method contained in that statute for gross receipts from broadcasting. Rather, it prescribed a ratio-based computation based on the location of the audience or subscribers for gross receipts from broadcasting.

Under ORS 314.665 and the related administrative rule, "an 'income-producing activity' is something that produces income for the taxpayer * * * [it] generates 'gross receipts' and results in an 'item of income.'" *AT&T Corp. v. Dept. of Rev.*, 357 Or 691, 711, 358 P3d 973

---

[10] The parties appear to agree that ORS 314.665(4) and the related administrative rule OAR 150-314.665(4) are relevant to understanding the phrase "income-producing activity." (*See* Ptf's MPSJ at 22-23.) Defendant did not address the rule in its briefing but did at oral argument.

(2015).[11]  OAR 150-314.665(4)(2)(d) provides a non-exclusive list of "income producing activit[ies]" including "[t]he sale, franchising, licensing or other use of intangible personal property."  Plaintiff argues that "all of the income producing activities of HBO [and the other networks] related to their licenses with the third-party distributors occurred outside Oregon * * *."  (Ptf's MPSJ at 29.)  Plaintiff supports that assertion with the following points: 1) "all of their activities in connection with the licensing of their programming to their Licensees occurred outside of Oregon" and 2) "the transmission [or] delivery of the programming content of HBO and [other networks] to the third-party distributors was via satellite located outside Oregon."  (*Id.*)  At oral argument, Defendant responded by noting that the definition of "income producing activity" includes "transactions and activities performed on behalf of a taxpayer, such as those conducted on its behalf by an independent contractor."  *See* OAR 150-314-665(4)(2).

In applying the term "income-producing activity" to Plaintiff's networks, it is important to consider the context of the interstate broadcaster statutes.  Plaintiff's first argument about the location of "activities in connection with licensing" appears to be an attempt to use the cost of performance sourcing rule in ORS 314.665(4).  That approach is contrary to Oregon's interstate broadcaster formula, which relies on the location of the audience or subscribers to source gross receipts from broadcasting.  ORS 314.684(4).

Plaintiff's second argument relies on the idea that the networks' "income-producing activity" is transmitting programming to its distributors.  (*See also* Ptf's MPSJ at 20 (stating the networks' "principal customers * * * were the third-party distributors/licensees").)  Plaintiff's point appears to be that its networks delivered programming to a location outside of Oregon: a

_____

[11] *AT&T* applied an earlier version of OAR 150-314-665(4) that did not include the activities of independent contractors.  The rule in effect for the tax years at issue included activities of independent contractors.

satellite.[12]  Yet, at this point, the incoming producing activity was incomplete, and the networks' income was indeterminate.  The distributors were required to transmit network programming to viewers in Oregon and elsewhere and compensate the networks based on the number of subscribers, including any pro rata reductions for failed transmission in the case of HBO.  Once again, Plaintiff's argument attempts to apply a sourcing method other than the one prescribed by ORS 314.684(4), which is based on the ratio of the broadcaster's audience or subscribers in this state compared to its total audience and subscribers.

4.      *Broadcaster conclusion*

The court concludes that the seven networks were interstate broadcasters within the meaning of ORS 314.680(3).  Assuming they each were taxable in Oregon – that is, they had substantial nexus – they are subject to the special sourcing formula in ORS 314.684.

B.      *Whether the Seven Networks were Taxable in Oregon*

Oregon imposes an excise tax on corporations "doing business" in the state.[13]  ORS 317.010(5); *see also Capital One*, 22 OTR at 331 (discussing imposition of tax on financial institutions).  "Doing business" is defined as "any transaction or transactions in the course of its activities conducted within the state by a national banking association, or any other corporation * * *."  ORS 317.010(4).  "A taxpayer is doing business when it engages in any profit-seeking activity in the State of Oregon."  OAR 150-317.010(4)(1).  "Oregon imposes taxes on or measured by net income to the extent allowed under state statutes, federal Public Law 86-272, and the Oregon and U.S. Constitutions."  OAR 150-317.010(1).

---

[12] The court notes that ORS 318.020(2) states that "[i]ncome from sources within this state includes income from tangible or intangible property located or having a situs in this state * * *."

[13] As noted above, a corporation that is not "doing business" in Oregon may still be subject to tax if it has "income derived from sources" within the state.  *See* OAR 150-317.010(4)(6); *see also* ORS 318.020.

For purposes of "jurisdiction to impose an excise tax for the privilege for doing business under ORS Chapter 317 * * * there must exist a substantial nexus between the state and the activity or income it seeks to tax." OAR 150-317.010(1).[14] " 'Substantial nexus' * * * does not require a taxpayer to have a physical presence in Oregon." OAR 150-317.010(2). It "exists where a taxpayer regularly takes advantage of Oregon's economy to produce income for the taxpayer and may be established through the significant economic presence of a taxpayer in the state." *Id.* The court begins by considering whether substantial nexus exists under the rule and, if so, whether it also exists under both the Due Process Clause of the 14th Amendment and Commerce Clause of the United States Constitution.

1.      *Nexus under OAR 150-317.010*

OAR 150-317.010(3) lists non-exhaustive factors that Defendant may consider to determine whether a taxpayer has a substantial nexus with Oregon. Here, Defendant relied on:

> "(a) Maintains continuous and systematic contacts with Oregon's economy or market [audience];
>
> "(b) Conducts deliberate marketing to or solicitation of Oregon customers [audience];
>
> "* * * * *
>
> "(d) Receives significant gross receipts attributable to customers [audience] in Oregon;
>
> "* * * * *."

(*See* Def's MPSJ at 14-15, quoting OAR 150-317.010(3) with brackets inserted by Defendant.) Defendant reasons that the networks had significant gross receipts attributable to Oregon customers based on compensation received per subscriber, including in Oregon. (*See id.* at 17.)

---

[14] The rule also applies to the corporate income tax under ORS chapter 318, not at issue here.

The networks' contacts with Oregon's market were continuous and systematic as illustrated by the numerous Oregon systems attached to HBO's affiliation agreement and the monthly subscriber reports, which included Oregon subscribers. (*See id.*) HBO spent $300 million on marketing, including cable television and interactive advertising that reached Oregonians. (*Id.* at 18.) Plaintiff disputes that any of those factors apply, reiterating that it "did not send any solicitations for business to Oregon residents or consumers" and noting that the networks' only contracts were with the third-party distributors, not Oregon customers or residents. (Ptf's Resp at 4.)

For reasons discussed above, the court agrees with Defendant that several factors in OAR 150-317.010(3) support its conclusion that the networks had substantial nexus with Oregon. The networks maintained continuous and systematic contacts with the Oregon market, sending programming that ultimately reached Oregon viewers and receiving payment on that basis. The networks received "significant gross receipts attributable to customers in Oregon" under the subscriber-based compensation structure of the affiliation agreements. Indeed, Defendant determined that the networks received income in excess of $100 million each year attributable to Oregon audiences or subscribers.

Similarly, the court agrees with Defendant that HBO conducted deliberate marketing in Oregon. The fact that HBO's marketing was nationwide rather than specifically targeted to Oregon does not change that outcome. *See Ooma Inc. v. Dept. of Rev.*, 369 Or 95, 105-106, 501 P3d 520 (2021) (rejecting taxpayer's argument that "targeting a forum" means targeting only one state to the exclusion of others; taxpayer's "effort to target customers in other states does not affect or diminish the constitutional significance of its effort to target customers in Oregon.") Finding the substantial nexus standard in OAR 150-317.010 satisfied, the court next considers

whether Oregon's taxation of the networks violates the Due Process Clause of the 14th amendment to the United States Constitution.

      2.       *Due Process Clause*

Plaintiff maintains that the networks lack nexus under the Due Process Clause of the 14th Amendment because the networks had no physical presence in Oregon and "did not directly receive any revenues from Oregon residents or customers." (*See* Ptfs' MPSJ at 12-13, *citing In re Washington Mutual, Inc.,* No. 08-12229, 485 BR 510 (Bankr D Del 2012).)

Nexus under the Due Process Clause involves a "two-step analysis" under *N. Carolina Dept. of Rev. v. The Kimberly Rice Kaestner 1992 Family Tr.*, 588 US 262, 139 S Ct 2213, 204 L Ed 2d 621 (2019): 1) a "minimum connection" between the state and the person, property, or transaction taxed; and 2) a rational relationship between the "income attributed to the State for tax purposes" and "values connected with the taxing State." *Ooma*, 369 Or at 99-100. Plaintiff does not address that analysis anywhere in its briefing. Plaintiff does not appear to distinguish between substantial nexus under the Commerce Clause and Due Process Clause. (*See* Ptf's MPSJ at 8 (subsection B addressing all "substantial nexus" issues under one heading).) That may be based on a reading of *South Dakota v. Wayfair*, 585 US 162, 177-78, 138 S Ct 2080, 201 L Ed 22 403 (2018), stating that there are "significant parallels" between "Due Process and Commerce Clause standards" though they are "not identical or coterminous * * *." *See also Global Hookah v. Dept. of Rev.*, 24 OTR 562, 592-93 (2021) (describing Due Process Clause nexus as a "second relevant level of nexus" under *Wayfair* and considering as a "check" on Commerce Clause analysis). Based on Plaintiff's limited briefing, the court confines its review here to *Washington Mutual.*

/ / /

*Washington Mutual* was a pre-*Wayfair* bankruptcy case concerning WMI, a holding company for Washington Mutual Bank. 485 BR at 513. Applying both the Due Process and Commerce Clauses, the court rejected Oregon's "attempt[] to hold WMI jointly and severally liable for corporate excise taxes incurred by the banking operations of its subsidiaries in Oregon." *Id.* at 520-521. WMI conducted no business activity in Oregon. *Id.* at 516. It "was simply a parent company that held stocks in its subsidiaries" and "[i]ts only source of income related to Oregon came from cash dividends from" its subsidiaries. *Id.* WMI owned intangible property – such as the "Power of Yes" slogan – that was used by its subsidiaries in Oregon, but WMI did not receive any income from the use of its intangible property. *See id.* Moreover, Oregon was "not seeking to tax the proceeds of any sale in Oregon of an intangible owned by WMI or the proceeds of the licensing of any intellectual property owned by WMI that was used in connection with business activity in Oregon." *Id.* at 520. Instead, the issue was WMI's liability for excise taxes incurred by its subsidiaries. *Id.* at 521. The court observed that the intellectual property itself must generate income to subject its holder to taxation. *Id.*

This case is readily distinguishable from *Washington Mutual*. The networks at issue here were not mere holding companies receiving dividends from subsidiaries. Rather, they generated significant income – including from Oregon viewers – through the activity of distributing cable programming. Plaintiff also notes its networks' lack of a physical presence in Oregon. Yet there is no such requirement for the corporate excise or income tax. *See Capital One*, 22 OTR at 332-34 ("doubting" that any such requirement exists for the corporate excise tax and finding no such requirement for the corporate income tax); *see also Capital One Auto Finance Inc. v. Dept. of Rev.*, 363 Or 441, 423 P3d 80 (2018), *aff'g* 22 OTR 326 (rejecting physical presence requirement for corporate income tax, which is imposed on income from sources within this state). "[N]exus

[to tax] exists whenever the corporation takes advantage of the economic milieu within the state to realize a profit." *Capital One*, 22 OTR at 334, *quoting American Refrigerator Transit v. State Tax Comm'n*, 238 Or 340, 395 P2d 127 (1964). Plaintiff received significant income from the distribution of its programming in Oregon, realizing a profit from the state's "economic milieu." Thus, Due Process Clause nexus requirements are satisfied in this case.

    3.    *Commerce Clause*

As with the broadcaster determination, nexus is determined at the level of the entity. ORS 717.715(3)(b). Here, again, the court is focused on the seven networks at issue. The court begins by reviewing and applying the substantial nexus test under *Wayfair*. The court then considers Plaintiff's argument against a finding of substantial nexus based on the networks' lack of direct sales to or contractual privity with Oregon viewers.

    a.    Substantial nexus under *Wayfair*

State laws "may not impose undue burdens on interstate commerce." *Wayfair*, 585 US at 173. To review the validity of a state tax under the Commerce Clause, the court applies the four-part test in *Complete Auto*: "The Court will sustain a tax so long as it (1) applies to an activity with a substantial nexus with the taxing State, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services the State provides." *Id.* at 174, citing *Complete Auto Transit, Inc. v. Brady*. 430 US 274, 97 S Ct 1076, 51 L Ed 2d 326 (1977). Here, Plaintiff's only challenge is under part one of the test, "substantial nexus."[15]

Prior to *Wayfair*, the Court had concluded under the "substantial nexus" test that physical presence was required for an out-of-state retailer in the sales and use tax context. 585 US at 174-75. Finding the physical presence rule was unnecessary to the Commerce Clause and created

_____

[15] Plaintiff claims unfair apportionment under ORS 314.670, discussed below. (Ptf's MPSJ at 25.)

market distortions, particularly with the rise of online retailers, the court eliminated the physical presence rule in *Wayfair*. *See id.* at 176-188. The court observed that in the modern, interconnected economy, with "targeted advertising and instant access to most consumers via any internet-enabled device, 'a business may be present in a State in a meaningful way without that presence being physical in the traditional sense of the term.'" *Id.* at 181 (citation omitted). In overruling the physical presence requirement, the court explained that the substantial nexus prong of the *Complete Auto* test is satisfied "when the taxpayer [or collector] 'avails itself of the substantial privilege of carrying on business' in that jurisdiction." *Id.* at 188 (citation omitted).

The South Dakota law at issue in *Wayfair* was triggered by a business having $100,000 in sales or 200 or more separate transactions. 585 US at 188. The court concluded that that "quantity of business could not have occurred unless the seller availed itself of the substantial privilege of carrying on business in South Dakota." *Id*. The Court further observed that the sellers challenging the law were "large, national companies that undoubtedly maintain an extensive virtual presence." *Id.* Thus, substantial nexus was satisfied. *Id.*

Both the Oregon Supreme Court and this court have now applied the ruling in *Wayfair*. In *Ooma*, the Oregon Supreme Court affirmed the Tax Court's conclusion that Oregon could impose its E911 tax on a California-based provider of VoIP services. 369 Or at 107-109. The court noted that "Ooma did more than $2.2 million in business in 39 months and provided thousands of lines of VoIP service," greater than the amounts sufficient for nexus in *Wayfair*. *Id.*

This court's application of the *Wayfair* ruling came in *Global Hookah*. 24 OTR at 564. The taxpayer in that case was a North Carolina based distributor of tobacco products that received orders through its website, sent a newsletter to a subscriber list, had an Oregon distributor license, and registered as a foreign corporation in Oregon after a state employee

directed it to do so. *Id*. In 2008, its Oregon sales "amounted to less than $10,000 * * * and fewer than 20 invoiced transactions * * *." *Id*.[16] Yet, the court found the taxpayer availed itself of the privilege of "carrying on a business" in Oregon. *Id*. at 597. Taxpayer "knew from its customers' shipping addresses that it was selling shisha into Oregon[,]" and it made sales into Oregon on a regular monthly basis. *Id*. With respect to the "substantial" requirement, the court concluded that a taxpayer whose activity rises to the level of 'carrying on business' necessarily exercises a privilege that is substantial in character. *Id*. To avoid nexus, a taxpayer "either must avoid the intentional connection with the state that is implicit in the term 'avail,' or the activities must lack the continuity implicit in 'carrying on' business." *Id*. at 598.

Returning to the present case, Plaintiff's networks generated revenue in excess of $100 million annually based on Oregon viewers. The networks were clearly aware of their viewers in Oregon: they received monthly subscriber reports from third-party affiliates, upon which payment was calculated. HBO's affiliation agreement with Comcast appended a list of systems, including numerous in Oregon. That is significantly more business in Oregon than was sufficient for nexus in either *Ooma* or *Global Hookah*. Nevertheless, Plaintiff argues that the networks lack nexus because they did not make direct sales to or otherwise contract with Oregon customers. (Ptf's MPSJ at 9, Resp at 3.) "[T]here is a complete absence of the requisite substantial economic or virtual contacts with consumers in Oregon noted by the Court in *Wayfair*." (Ptf's Resp at 3.) Plaintiff's argument leads to a new question: : Does the networks' use of third-party affiliates to distribute programming alter the conclusion that the networks were carrying on business in Oregon under *Wayfair*?

/ / /

_____

[16] The taxpayer's business grew in subsequent tax years, also at issue. 24 OTR at 564.

b.      Use of third-party affiliates to carry on business

In considering whether substantial nexus exists for taxation, the Supreme Court has held that taxpayer's use of an independent contractor to conduct business in the state does not defeat a finding of nexus. *Tyler Pipe v. Washington State Dept. of Rev.*, 483 US 232, 250, 107 S Ct 2810, 97 L Ed 2d 199 (1987). "[T]he crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." *Id.* More recently, states have considered some version of this issue in the contexts of online businesses and companies that license the use of intangible property.

Several states have considered whether nexus existed with online travel agencies that contracted with in-state hotels for the right to hotel reservations online. In each case, the hotels were unrelated to the online travel agencies. In *Travelscape v. South Carolina Department of Revenue*, 391 S.C. 89, 705 S E 2d 28 (2011), the South Carolina Supreme Court held that an out-of-state, online travel agency had substantial nexus with South Carolina based on its contracts with in-state hotels for the right to offer discounted reservation rates online. *Id.* at 37. The court explained:

> "Without the hotels actually providing the sleeping accommodations to the customer, Travelscape would be entirely unable to conduct business within the state. For Commerce Clause nexus purposes, it simply does not matter that Travelscape specifically disclaims any agency relationship with the hotels in the contracts it enters into."

*Id.* The Supreme Court of Wyoming similarly concluded that various online travel companies had substantial nexus with the state, notwithstanding the fact that unrelated hotels provided the lodging. *See Travelocity.com v. Wyoming Dept. of Rev.*, 2014 WY 43, 329 P3d 131, 148 (Wyo. 2014). In another case, *Mayor & City Council of Baltimore v. Priceline.com*, 2012 WL

3043062, an online travel company sought to avoid nexus, explaining that an online hotel booking involved two distinct transactions: money paid for the use of a hotel room and money paid for the company's "travel facilitation services." *Id.* at *3. Despite doubting that a consumer would make that distinction, the court found nexus existed based on the "travel facilitation" because the hotels were in Baltimore. *Id.* at *4. An out-of-state company may not avoid nexus because it relies on third-party contracts to conduct its business in-state.

In the same way that the online travel companies relied upon contracts with unrelated hotels to carry on their business, Plaintiff's networks needed distributors (such as Comcast) to transmit their programming to viewers, including in Oregon. Otherwise, the networks had no business. As with travel agencies, for substantial nexus, it does not matter that the distributors were third parties or that Plaintiff disclaimed any agency relationship with them. From the consumers' perspective, they paid to see the networks' programming. That is acknowledged in the HBO affiliation agreement with Comcast: failure to receive a transmission of HBO permits Comcast to reduce the fee due from the subscriber and, in turn, remit a pro rata reduced fee to HBO.

Plaintiff notes a lack of direct sales to Oregon consumers, but that is not necessary for nexus. For instance, in *KFC Corp. v. Iowa Dept. of Rev.*, 792 N W 2d 308 (2010), the Iowa Supreme Court found substantial nexus to tax an out of state corporation with no physical presence in Iowa that received revenue from use of its intangible property within state. Taxpayer licensed its trademarks and "related system[s]" to "independent franchisees" who owned KFC restaurants. *Id.* at 310. Under the franchise agreements, the franchisees were required to adhere to taxpayer's requirements for menu items, advertising, marketing, and physical facilities. *Id.* at 311. The court found that "the presence of transactions within the state that give rise to KFC's

revenue provide a sufficient nexus under established Supreme Court precedent." *Id.* at 323. Similarly, Plaintiff's networks received revenue from the distribution of their programming to Oregon viewers by third-party affiliates, creating a sufficient nexus with Oregon. The court finds no support for Plaintiff's contention that the networks lacked substantial nexus with Oregon based either upon the networks' use of third-party distributors to conduct their business or upon the networks' lack of direct sales to Oregon customers.

C.      *Fair Apportionment*

Plaintiff argues that "the auditor's proposed adjustments to the numerator of Time Warner's sales factor have resulted in an apportionment formula which does not fairly reflect the extent of Time Warner's business activity in Oregon" under ORS 314.670.[17] (Ptf's MPSJ at 24-25.) Many of Plaintiff's arguments are restatements of points addressed in this Order. (*See id.* at 25 (asserting networks were not broadcasters or taxable in Oregon). One point of contention is well-taken: the auditor's "application of an audience factor to source the gross receipts of all members of Time Warner's consolidated return group." (*Id.*) In light of the recent ruling in *ABC*, Defendant now agrees that the special broadcaster apportionment formula applies only to those entities that were interstate broadcasters. (Def's Resp at 11-12.) Defendant requests more time and possibly discovery to make that determination. (*Id.*) The court concludes the issue of fair apportionment under ORS 314.670 is premature and declines to rule on it at this time.

### III. CONCLUSION

Upon careful consideration, the court concludes that seven of Plaintiff's networks were interstate broadcasters under ORS 314.680(3) and were taxable in Oregon: HBO, TBS, CNN,

---

[17] ORS 314.670 permits an alternative method of apportionment "[i]f the application of the allocation and apportionment provisions of ORS 314.605 to ORS 314.675 do not fairly represent the extent of the taxpayer's business activity in this state * * *."

Courtroom TV, Cartoon Network, TCM, and TNT. Whether any of Plaintiff's other affiliates were broadcasters has yet to be determined so Plaintiff's challenge of unfair apportionment under ORS 314.670 is premature. Now, therefore,

IT IS ORDERED that Plaintiff's Cross-Motion for Partial Summary Judgment is denied.

IT IS FURTHER ORDERED that Defendant's Motion for Partial Summary Judgment is granted in part, with respect to the seven networks at issue, and denied in part, with respect to Plaintiff's other affiliates.

IT IS FURTHER ORDERED that, within 30 days from the date of this Order, the parties will file a joint written status report proposing next steps.

_____

*This interim order may not be appealed. Any claim of error in regard to this order should be raised in an appeal of the Magistrate's final written decision when all issues have been resolved. ORS 305.501.*

*This Order was signed by Presiding Magistrate Allison R. Boomer, and entered on March 31, 2025.*